**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | |
|---|---|
| REBECCA HUNT, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 99-4158-CV-C-5 |
| v. ) | |
| ) | |
| STATE OF MISSOURI, DEPARTMENT ) | |
| OF CORRECTIONS, et al., ) | |
| ) | |
| Defendants. ) | |

**SUGGESTIONS IN SUPPORT OF SUMMARY JUDGMENT**

# TABLE OF CONTENTS

A. This Court Lacks Jurisdiction to Hear Plaintiffs' Sexual Harassment and Retaliation Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1. Plaintiffs Were Not Employees of the State of Missouri, Department of Corrections, and Thus Cannot Sue the State Pursuant to Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2. State Sovereign Immunity Bars Plaintiffs' MHRA Claims . . . . . . . . . . . . 8

B. Plaintiffs' Sexual Harassment Claim - Hostile Work Environment . . . . . . . . . . . . . . . . . . . . 8

C. Plaintiffs' Retaliation Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# TABLE OF AUTHORITIES

**CASES**:

*Caleshu v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    737 F.Supp. 1070 (E.D.Mo. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Callanan v. Runyon*, 75 F.3d 1293, 1296 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Coller v. State of Missouri, Dep't of Economic Devel.*, 965 F.Supp.
    1270, 1274 (W.D.Mo. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Comstock v. Consumers Markets, Inc.*, 953 F.Supp.,
    1096, 1102 (W.D.Mo. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367 (1993) . . . . . . . . . . . . . . . . . 8, 9

*Lambersten v. Utah Dep't of Corrections*, 79 F.3d 1024 (10th Cir. 1996) . . . . . . . . . . . . . . . . . 3

*Montandon v. Farmland Indus. Inc.*,
    116 F.3d 355, 359 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pennhurst School & Hosp. v. Halderman,* 465 U.S. 89, 121, 104
    S.Ct. 900 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Schwieger v. Farm Bureau Ins. Co. of Nebraska*, 2000 WL 298068, 2
    (8th Cir., Mar. 23, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4-6

*Zinn v. McKune*, 143 F.3d 1353, 1356 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1


**STATUTORY PROVISIONS**:

Title 217 of the Revised Missouri Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. § 2000e-2(a)

42 U.S.C. § 2000e(f)

A.  **This Court Lacks Jurisdiction to Hear Plaintiffs' Sexual Harassment and Retaliation Claims**

Defendant State of Missouri, Department of Corrections, is entitled to summary judgment as a matter of law regarding plaintiffs' sexual harassment and retaliation claims under Title VII and the MHRA because this Court lacks jurisdiction.

1.  **Plaintiffs Were Not Employees of the State of Missouri, Department of Corrections, and Thus Cannot Sue the State Pursuant to Title VII**

Title VII of the Civil Rights Act of 1964 provides that "it shall be unlawful for an employer" to discriminate against an employee on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Title VII applies only to situations involving an "employer-employee relationship." 42 U.S.C. § 2000e(f). Title VII protects only employees, not independent contractors. *Schwieger v. Farm Bureau Ins. Co. of Nebraska*, 2000 WL 298068, 2 (8th Cir., Mar. 23, 2000) (copy attached). Thus plaintiffs' employment status is both a jurisdictional question and an aspect of their substantive claims of sexual harassment and retaliation. *Zinn v. McKune*, 143 F.3d 1353, 1356 (10th Cir. 1998).

Because Title VII contains a "circular definition" of "employee" ("an individual employed by an employer"), the Eighth Circuit applies the definition of the "conventional master-servant" relationship as understood by "common-law agency doctrine." *Schweiger,* 2000 WL 298068, 2. Under this approach, determining whether an employer-employee relationship exists, or whether an individual is instead an independent contractor, "involves consideration of all aspects of the working relationship between the parties." *Id*.

The "aspects," or factors, to be considered in making this determination include the hiring party's right to control the manner and means by which a task is accomplished; the skill required;

1

the source of the instrumentalities and tools; the location of the work; the duration of the relationship; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. *Id*. Also considered are the "economic realities" of the worker's situation, including factors such as how the work relationship may be terminated and whether the worker receives annual leave from the hiring party. *Id*.

In evaluating the aspects of the relationship between defendant and plaintiffs, it is clear that no "employer-employee" relationship existed and that plaintiffs were, instead, independent contractors. First, Don Cline, Associate Superintendent of Operations at JCCC, signed plaintiffs' timecards.[1] But neither Cline nor Dave Dormire, the Superintendent at JCCC, controlled the manner and means by which plaintiffs performed their work as "employee health nurses."[2] And there is no evidence that Dormire and Cline "second guessed" plaintiffs' medical decisions, or that they attempted to resolve medical issues that presented themselves to plaintiffs. Plaintiffs contacted Julie Ives, RN-V and the Department's Employee Health and Safety Coordinator, if they had questions about nursing protocols or had other nursing-related questions.[3]

---

[1] Exhibit E (Ives Depo) at 9.

[2] *Id.*

[3] *Id.* at 10; Exhibit G (Nurnberg Depo) at 40-41.

Neither Dormire, Cline, nor Ives gave plaintiffs performance evaluations. Instead, the contract between the State and Favorite Nurses dictated that the contractors "shall work independently with a minimum of supervision," and the only review their work would receive by the State would be a review for "conformance with established nursing policies."[4] Favorite Nurses evaluates its employees on a periodic basis.[5]

Plaintiffs' situation is analagous to that of the plaintiff in *Lambersten v. Utah Dep't of Corrections*, 79 F.3d 1024 (10th Cir. 1996). The plaintiff worked as a schoolteacher in a prison academy and alleged discrimination in violation of Title VII. *Id*. at 1026. The defendant Utah Department of Corrections, or its employees, coordinated access to the classroom in which plaintiff worked, patrolled the classroom, and reviewed all classroom materials and equipment used by the plaintiff. *Id*. The plaintiff, like Hunt and Nurnberg,[6] was also required to undergo a background check prior to beginning work at the prison, and her entrance into the prison was controlled by prison officials. *Id.* A local school district was responsible for all funding associated with the educational services provided by the prison academy where the plaintiff worked. *Id*.

The *Lambersten* court found that "although the Department [of Corrections] physically controlled plaintiff's entry into the Correctional Facility and provided security for plaintiff and other employees of the Academy, the uncontroverted evidence indicates that plaintiff's employer was the School District. Most notably, there is simply no evidence in the record from which a finder of fact

---

[4] Exhibit C (Contract Between State and Favorite Nurses) at 2.2.11.

[5] Exhibit A (Employee Handbook) at 000138.

[6] Exhibit C (Contract Between State and Favorite Nurses) at ¶ 2.2.12.

could conclude the Department controlled the means or the manner in which plaintiff performed her day-to-day work. Rather, the uncontroverted evidence makes clear that the major terms of plaintiff's employment (e.g., work assignments, pay, etc.) were controlled by the School District." *Id*. at 1028-29. Similarly, Hunt and Nurnberg were allowed to make independent decisions regarding their day-to-day work involving JCCC employees' medical issues. Defendant, and defendants' employees, did not control the means or the manner in which they performed their work as nurses. Thus, this factor suggests classifying plaintiffs as independent contractors.

Second, with regard to the "skill required," plaintiffs, as professional nurses, have been licensed since 1989 and 1984, respectively, approximately ten years or more before they began working at JCCC.[7] There is no evidence that defendant paid for plaintiffs' nursing licenses or was involved in any way with the plaintiffs becoming licensed.

In *Schweiger*, the Eighth Circuit considered whether an insurance agent, who alleged that she was discriminated against because of her gender, was an employee of Farm Bureau Insurance Company for Title VII purposes. The insurance agent, like Hunt and Nurnberg, was a "professional" who was required to be licensed and subject to a code of ethics. As a result, the Eighth Circuit found that the "skills required" factor weighed "heavily in favor of independent contractor status." *Schweiger*, 2000 WL 298068, 4.

The next factors, the "source of the instrumentalities and tools" and the "location of the work," arguably weigh in favor of an employer-employee relationship. *See id*. at 5. Plaintiffs are required to have a nursing license, but as stated above, defendant did not pay for or in anyway

---

[7] Exhibit G (Nurnberg Depo) at 8; Exhibit D (Hunt Depo) at 14.

contribute to their licensure. But the "tools" to work as "employee health nurses" at JCCC, such as forms, medical supplies, and office space, were provided by the facility.

The next two factors are "the duration of the relationship between the parties" and "whether the hiring party has the right to assign additional projects to the hired party." Specifically, plaintiffs worked at JCCC as "employee health nurses" from December 1997 until June 30, 1998 (Hunt) and July 10, 1998 (Nurnberg), a period of approximately eight months.[8] Unlike the plaintiff in *Schweiger*, who had a long-standing relationship with Farm Bureau Insurance of over fifteen years, Hunt and Nurnberg's short-term relationship militates toward their independent contractor status. *See Schweiger*, 2000 WL 298068, 1, 5. And pursuant to the contract between the State of Missouri and Favorite Nurses, neither Favorite or defendant was allowed to reassign plaintiffs to a facility other than JCCC without prior notice and approval.[9] Nor was defendant allowed to assign plaintiffs additional projects or tasks outside of their role as "employee health nurses" who, pursuant to the contract between the State and Favorite, were responsible for conducting nursing assessments, diagnosing and providing careplans, coordinating an employee health program, conducting TB testing, and other specified nursing activities.[10] As a result, this factor also points to the conclusion that plaintiffs were independent contractors.

The seventh factor, "the extent of the hired party's discretion over when and how long to work," arguably leans toward independent contractor status. The contract between defendant and

---

[8] Doc. No. 1 at ¶¶ 13, 53.

[9] Exhibit C (Contract between State and Favorite Nurses) at 2.2.5, 2.4.7.

[10] *Id*. at 2.2.8 - 2.2.10.

Favorite Nurses required the "employee health nurses" at JCCC to be on-site thirty-eight hours per week.[11] But plaintiffs had some say in determining when they would work the thirty-eight hours required by the contract.[12] Further, the "method of payment" also weighs in favor of plaintiffs independent contractor status. Although Cline was responsible for signing their timecards, defendant did not pay plaintiffs. Instead, plaintiffs reported their hours worked to Favorite Nurses and were paid by Favorite Nurses.[13]

Factor nine, "the hired party's role in hiring and paying assistants," is not applicable in this situation. There were no "medical assistants" working in the "employee health nurse" office at JCCC with plaintiffs.

The tenth and eleventh factors, whether the work is "part of the regular business of the hiring party" and "whether the hiring party is in business" both count in favor of plaintiffs being independent contractors. *See Schweiger*, 2000 WL 298068, 5. The JCCC facility is a prison and the Department of Corrections is not "in business" as a health care facility. Providing "employee health nurse" care to JCCC employees is also not a part of the Department of Corrections' statutory obligations. *See* Title 217 of the Revised Missouri Statutes.

The next two factors, "the provision of employee benefits" and "the tax treatment of the hired party," both plainly weigh in favor of plaintiffs' independent contractor status. *See Schweiger*, 2000 WL 298068, 5. Defendant did not provide employee benefits to plaintiffs, however, Favorite Nurses

---

[11] *Id.* at 2.2.2(a).

[12] Exhibit B (MacLeod Depo) at 21.

[13] *Id.* at 24-25, 30-31; Exhibit A (Employee Handbook) at 000137.

6

provides its employees with continuing education expense reimbursement, insurance benefits, a referral bonus, a "cafeteria" or "section 125" tax-savings plan, and a 401k employee savings plan.[14] Plaintiffs were also required to submit their withholding allowance certificate and "form W-4," for income tax purposes, to Favorite Nurses.[15]

Lastly, the "economic realities" of the relationship between defendant and plaintiffs must be considered. The first "economic reality" factor, how the work relationship may be terminated, weighs in favor of independent contractor status. Plaintiffs were not hired directly by defendant. Instead, defendant contracted with Favorite Nurses to provide "employee health nurses" at various prisons, including JCCC.[16] And defendant had sole discretion as to whether the contract would be renewed.[17] The second "economic reality" factor, whether the worker receives annual leave, likewise weighs in favor of plaintiffs being independent contractors. Plaintiffs were not provided any type of paid or unpaid leave by defendant. Instead, Favorite Nurses provides its employees with vacation pay based on the number of hours worked.[18] Favorite Nurses also provides its employees with overtime and holiday pay in certain circumstances.[19]

Plaintiffs were not hired by defendant as "employees" of the Department of Corrections. Instead, defendant contracted with Favorite Nurses to provide part-time "employee health nurses"

---

[14] Exhibit A (Employee Handbook) at 000141-000143.

[15] *Id.* at 000145-000146.

[16] Exhibit C (Contract between State and Favorite Nurses) at 2.2.2.

[17] *Id.* at 2.4.1.

[18] Exhibit A (Employee Handbook) at 000142.

[19] *Id.* 000137.

at various facilities, including JCCC. The overwhelming majority of the factors weigh heavily in favor of plaintiffs' independent contractor status. As a result, defendant is entitled to summary judgment as a matter of law because there is no "employer-employee" relationship between defendant and plaintiffs for the purposes of Title VII.

### 2. State Sovereign Immunity Bars Plaintiffs' MHRA Claims

The MHRA provides for actions in Missouri circuit courts, but it does not authorize actions in federal courts. *Coller v. State of Missouri, Dep't of Economic Devel.*, 965 F.Supp. 1270, 1274 (W.D.Mo. 1997). Moreover, pendant jurisdiction cannot override Eleventh Amendment immunity as to a state law claim. *Pennhurst School & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900 (1984). As a result, defendant is entitled to summary judgment regarding plaintiffs' MHRA claims.

### B. Plaintiffs' Sexual Harassment Claim - Hostile Work Environment.

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367 (1993). The standard enunciated by the Supreme Court in *Harris* "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id*. "Conduct that is not severe or pervasive enough to create an *objectively* hostile or abusive work environment," however, "is beyond Title VII's purview." *Id.* (emphasis added).

The Supreme Court has noted that the test to be used in evaluating whether the conduct complained of rose to the level of sexual harassment through an abusive work environment is not, by its nature, a mathematically precise test. "[W]hether an environment is 'hostile' or 'abusive' can

be determined only by looking at all the circumstances. These may include frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23. Also, "psychological harm, like any other relevant factor, may be taken into account, [but] no single factor is required." *Id*.

The Eighth Circuit has mandated that to prevail on a hostile work environment claim, a plaintiff must establish that she belongs to a protected group; she was subject to unwelcome sexual harassment; the harassment was based on sex; the harassment affected a term, condition, or privilege of employment; and her employer knew or should have known of the harassment and failed to take proper remedial action. *Callanan v. Runyon*, 75 F.3d 1293, 1296 (8th Cir. 1996). In other words, plaintiff must first make a *prima facie* showing that the sexually harassing action took place. The employer may then rebut the showing either directly by proving the events did not take place, or indirectly, by showing that the events were isolated or generally trivial. Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. The employer can also rebut this showing directly, or by pointing to a prompt remedial action reasonably calculated to end the harassment. *Caleshu v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 737 F.Supp. 1070 (E.D.Mo. 1990).

Conduct that is merely offensive, conduct that is not so pervasive and severe to create an objectively hostile work environment, is beyond Title VII's purview. Harris, 510 U.S. at 22. "More than a few isolated incidents of harassment must have occurred to establish a violation of Title VII. Instead of sporadic incidents, there must be a steady barrage of opprobrious offensive comments." *Comstock v. Consumers Markets, Inc.*, 953 F.Supp. 1096, 1102 (W.D.Mo. 1996).

9

Plaintiffs fail to establish a *prima facie* case of a hostile work environment resulting from sexual harassment because the conduct alleged is not sufficiently severe or pervasive. For example, plaintiffs allege that Mitch Perry and Rodney Seaman, Fire Safety Coordinators at JCCC,[20] conducted a two-day tour of the maximum-security facility that houses dangerous offenders,[21] when they began working as "employee health nurses."[22] Hunt claims Seaman and Perry "paired off" with she and Nurnberg and stayed at her and Nurnberg's side during the tour.[23] Plaintiffs claim that Seaman and Perry "leered" at their chests and Hunt's "behind" during the tour.[24] Plaintiffs also claim that Seaman and Perry stood outside the ladies' restroom while they used the restroom.[25] Seaman also allegedly made comments at various times to Hunt that he liked her clothing.[26]

Plaintiffs did not tell either Seaman or Perry that they were uncomfortable with the men's presence during the tour of JCCC.[27] Nurnberg did not say anything to Seaman or Perry because she was "too polite" and "wanted to really assess what was going on."[28] Nor did plaintiffs file a

---

[20] Exhibit E (Ives Depo) at 16-17.

[21] Exhibit G (Nurnberg Depo) at 61.

[22] Exhibit D (Hunt Depo) at 59-60.

[23] *Id.* at 60.

[24] *Id.* at 62; Exhibit G (Nurnberg Depo) at 44-45.

[25] Exhibit D (Hunt Depo) at 60-66; Exhibit G (Nurnberg Depo) at 44.

[26] Exhibit D (Hunt Depo) at 83-84.

[27] Exhibit D (Hunt Depo) at 61-62; Exhibit G (Nurnberg Depo) at 45-46.

[28] Exhibit G (Nurnberg Depo) at 46.

grievance with Favorite Nurses,[29] even though Favorite has a written employee grievance procedure and a written sexual harassment policy.[30]

Plaintiffs did inform Julie Ives during their first week of working at JCCC that Seaman and Perry made them uncomfortable during the tour, and that Seaman and Perry thought they were plaintiffs' supervisors.[31] Plaintiffs did not tell Julie Ives that Seaman and Perry were sexually harassing them until they contacted Ives a second time approximately three weeks later.[32]

After plaintiffs first complained to Julie Ives about Seaman and Perry, Ives contacted Perry and told the men to "back off" from Hunt and Nurnberg.[33] Both plaintiffs admit that after they contacted Julie Ives the first time, Perry was around them and in their work area infrequently and he no longer harassed them.[34] Hunt claims, however, that Seaman continued to be "overly friendly" with her and was in the nurses' office "much of the time" after she and Nurnberg complained to Ives.[35]

---

[29] Exhibit D (Hunt Depo) at 80-81.

[30] Exhibit A (Employee Handbook) at 000139.

[31] Exhibit D (Hunt Depo) at 67; Exhibit G (Nurnberg Depo) at 56-58. Plaintiffs also claim that they complained to other Department of Corrections officials about Seaman and Perry, including Major James Eberle, Marvin Cundiff, Dave Dormire, Debra Clay and Alma McKinney. Exhibit D (Hunt Depo) at 143-144. Plaintiffs also filed a complaint with the JCCC Investigator's Office. *Id*.

[32] Exhibit D (Hunt Depo) at 136-137.

[33] Exhibit E (Ives Depo) at 23-28.

[34] Exhibit D (Hunt Depo) at 122-123; Exhibit G (Nurnberg Depo) at 61.

[35] Exhibit D (Hunt Depo) at 122-123.

Even if the incidents that plaintiffs describe occurred, they are not "severe or pervasive," nor do they amount to a "barrage of opprobrious offensive comments" as this Court envisioned in *Comstock*. Plaintiffs instead complain of a handful of isolated incidents that, for the most part, occurred in their first two days of work at JCCC. As a result, plaintiffs fail to state *prima facie* case of a hostile work environment resulting from sexual harassment.

Moreover, even if Seeman and Perry committed the acts they are accused of, the conditions of plaintiffs' employment were not altered by defendant. Plaintiffs voluntarily quit working at JCCC and voluntarily ceased their employment with Favorite Nurses after they contacted a lawyer.[36]

Defendant did not end its contract with Favorite Nurses,[37] nor is there any evidence that defendant told Favorite that the services of plaintiffs at JCCC were no longer wanted or required. Defendant did not demote, transfer, give a cut in salary or benefits, or fire plaintiffs, nor could defendant have done those things because plaintiffs were not defendant's employees. Defendant did not alter the conditions of plaintiffs' employment and any change that occurred was a result of their voluntary actions. And plaintiffs both became employed elsewhere a short time after the quit working for Favorite Nurses; Hunt working for the State of Missouri, Division of Medical Services, and Nurnberg working for Lewis and Clark School in Jefferson City.[38]

---

[36] In May 1998, approximately two months before they quit working at JCCC, plaintiffs informed Deborah MacLeod, Favorite Nurses' Vice-President, that they had retained a lawyer. Exhibit B (MacLeod Depo) at 38-43; Exhibit D (Hunt Depo) at 118. Plaintiffs subsequently submitted voluntary resignation letters. Exhibits H and I (Letters of Resignation).

[37] Favorite Nurses continues to provide "employee health nurses" to Department of Corrections' facilities, including JCCC, pursuant to the contract between the State of Missouri and Favorite. Exhibit B (MacLeod Depo) at 120.

[38] Exhibit D (Hunt Depo) at 88, 25-26; Exhibit G (Nurnberg Depo) at 15-16.

## C. Plaintiffs' Retaliation Claim.

A *prima facie* case of retaliation under Title VII consists of three elements: (1) that the employee engaged in a statutorily protected activity; (2) that the employer took adverse employment action against the employee; and (3) that a causal connection exists between the protected activity and the subsequent adverse action. *Montandon v. Farmland Indus. Inc.*, 116 F.3d 355, 359 (8th Cir. 1997). Once the plaintiff establishes a *prima facie* case, the employer may rebut by advancing a legitimate, nonretaliatory reason for the adverse employment action. Finally, if the employer makes this showing, the plaintiff must demonstrate that the proffered reason is pretextual for illegal retaliation. *Id*. at 359.

Plaintiffs claim that after they complained about Seaman and Perry's conduct, Department of Corrections officials retaliated against them by making it difficult to get their timecards signed; a "petition" against them was circulated at JCCC; after they quit working at JCCC, the pictures from their identification badges and their identification number were circulated "to everyone's view"; their work hours were changed; and Dormire, Superintendent of JCCC, was no longer friendly to them and he walked past the "employee health nurse" office at JCCC several times per day.[39] Hunt also claims that prior to complaining about Seaman and Perry, she and Nurnberg were told that if the "employee health nurse" program at JCCC was successful, they would become employees of the

---

[39] Exhibit D (Hunt's Depo) at 84-87, 167-172.

State of Missouri.[40] But after she and Nurnberg complained, their becoming employees of the State was no longer discussed.[41]

But plaintiffs' retaliation claim fails for several reasons. First, as stated above, there was no employer-employee relationship between them and defendant. Second, they suffered no adverse employment action by defendant. It is undisputed that plaintiffs submitted voluntary letters of resignation to JCCC and voluntarily quit working at Favorite Nurses. Neither plaintiff suffered a reduction in wages or hours worked, there was no change in their substantive duties as "employee health nurses," and there was no change in other terms or conditions of their employment with Favorite Nurses. As a result, their retaliation claim must fail as a matter of law.

WHEREFORE, in view of the foregoing, defendant respectfully requests that this Court grant its motion for summary judgment as a matter of law. Defendant further requests oral argument on this motion if this Court deems argument appropriate.

---

[40] *Id.* at 171-172.

[41] *Id.*

Respectfully submitted,

JEREMIAH W. (JAY) NIXON
Attorney General

/s/
VIRGINIA HURTUBISE MURRAY
Missouri Bar No. 48770

SARA L. TROWER
Missouri Bar No. 34732

Assistant Attorneys General
P.O. Box 899
Jefferson City, Missouri 65102
Phone: (573) 751-3321
Fax: (573) 751-9456

ATTORNEYS FOR DEFENDANT
STATE OF MISSOURI, DEPARTMENT
OF CORRECTIONS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed, postage prepaid, this 16th day of June, 2000, to: Martin Meyers and Stephen C. Thornberry of The Meyers Law Firm, 2850 City Center Square, 1100 Main Street, Kansas City, Missouri 64105-2112.

/s/
_____
Assistant Attorney General