# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| **REBECCA HUNT, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )  **Case No. 99-4158-CV-C-5** |
| | ) |
| **STATE OF MISSOURI, DEPARTMENT** | ) |
| **OF CORRECTIONS, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

### SUGGESTIONS IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

---

**THE MEYERS LAW FIRM**
Martin M. Meyers          MO     #29524
*mmeyers@meyerslaw.com*
Stephen C. Thornberry     MO     #44354
*sthornberry@meyerslaw.com*
2850 City Center Square
1100 Main Street
Kansas City, Missouri 64105-2112
(816) 421-4040
(816) 421-4020 - Fax
ATTORNEYS FOR PLAINTIFF

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PLAINTIFF'S RESPONSE TO DEFENDANT'S
        STATEMENT OF UNCONTROVERTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    STATEMENT OF ADDITIONAL MATERIAL FACTS PRECLUDING
        SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

V.      ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        A.      Title VII Prohibits Defendant's Sexual Harassment of Plaintiffs . . . . . . . . . . . . 28

        B.      There are Genuine Issues of Material Fact on Each Element of
                Plaintiffs' Claims of  Sexually Hostile Work Environment . . . . . . . . . . . . . . . . 31

        C.      Plaintiffs Have Demonstrated That Genuine Issues of Material
                Fact Exist on Each Element of Their Retaliation Claims . . . . . . . . . . . . . . . . . . 37

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, S.Ct. 2505, 91 L.Ed.2d 202 (1986) . . . . . . . . 27

*Carlyle v. Lai*, 783 S.W.2d 925 (Mo.App. W.D. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . 38-39

*Comstock v. Consumers Markets, Inc.*, 953 F.Supp. 1096 (W.D.Mo. 1996) . . . . . . . . . . . 27, 31

*Cossette v. Minn. Power & Light*, 188 F.3d 964 (8th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . 38

*Delashmutt v. Wis-Pak Plastics, Inc.*, 990 F.Supp. 689 (N.D.Iowa 1998) . . . . . . . . . . . . . . . 37

*Diana v. Schlosser*, 20 F.3d 348 (D.Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Doe on Behalf of Doe v. St. Joseph's Hosp.*, 788 F.2d 411 (7th Cir.1986) . . . . . . . . . . . . . . . 28

*Duncan v. Junior College District of St. Louis, et al.,* No. 4:98CV01220
        (unpublished opinion November 15, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31

*Gillming v. Simmons Industries*, 91 F.3d 1168 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 32

*Gomez v. Alexian Bros. Hosp.*, 698 F.2d 1019 (9th Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hall v. Gus Const. Co., Inc.,* 842 F.2d 1010 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 32, 35

*Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) . . . . 31-32

*Hathaway v. Runyon,* 132 F.3d 1214 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 32-35, 37

*Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Howard v. Burns Bros., Inc.,* 149 F.3d 835 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 32-34, 37

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*King v. Chrysler Corp.*, 812 F.Supp. 151 (E.D. Mo.1993) . . . . . . . . . . . . . . . . . . . . . . . . . 28-31

*Ledergerber v. Stangler*, 122 F.3d 1142 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399,
     91 L.Ed.2d 49 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

*Moland v. Bil-Mar Foods,* 994 F.Supp. 1061 (N.D. Iowa 1998) . . . . . . . . . . . . . . . . . . . . 28-31

*Ray v. Henderson*, 2000 WL 897778 (9th Cir., July 7, 2000) . . . . . . . . . . . . . . . . . . . . . . . . 39-40

*Rorie v. United Parcel Service, Inc.,* 151 F.3d 757 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 33

*Schwieger v. Farm Bureau Ins. Co. of Nebraska,* 2000 WL 298068,
     (8th Cir., Mar.23, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527 (11th Cir.1990) . . . . . . . . . . . . . . . . . . . . . 28

*Sibley Memorial Hospital v. Wilson,* 488 F.2d. 1338 (D.C. Cir. 1973) . . . . . . . . . . . . . . . 28-31

*Smith v. World Ins. Co.,* 38 F.3d 1456 (8th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Spirt v. Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054 (2d Cir.1982) . . . . . . . . . . . . . . . . . . . . 28

*West v. Marion Merrell Dow, Inc.*, 54 F.3d 493 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 38

*Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291 (11th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . 28

**Rules**

*Fed.R.Civ.P. 56(c)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Statutes**

*42 U.S.C. § 2000e* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*42 U.S.C. § 2000e-2* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*42 U.S.C. § 2000e-3* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**EEOC Guidelines**

EEOC Compliance Manual Section 8, "Retaliation" (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | | |
|---|---|---|
| **REBECCA HUNT, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 99-4158-CV-C-5** |
| | ) | |
| **STATE OF MISSOURI, DEPARTMENT** | ) | |
| **OF CORRECTIONS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## SUGGESTIONS IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Rebecca Hunt and Susan Nurnberg state the following for their Suggestions in Opposition to Defendant's Motion for Summary Judgment and urge the Court to deny defendant's Motion.

## I.    BACKGROUND FACTS

Beginning on the first day of their employment, plaintiffs Rebecca Hunt and Susan Nurnberg were subjected to a sexually hostile work environment by two employees of defendant State of Missouri, Department of Corrections — Fire and Safety Specialists Mitchell Seaman and Rodney Perry.   Despite plaintiffs' immediate and repeated complaints to their supervisor, Julie Ives, the conduct continued.  Plaintiffs then complained to Seaman and Perry's supervisor, Superintendent Dave Dormire, but were told that their complaints would do the program a lot of damage.  They also complained to two different human resources officials n the department and still no action was taken.  Plaintiffs finally were able to stop the sexual harassment only by going to an investigator for the Department, Arthur Dearixon, who immediately ordered the two

offending employees to stay away from plaintiffs. At that point, Superintendent Dormire and Nurse Ives began to retaliate against plaintiffs for taking the complaint to Dearixon. Dormire suggested to plaintiffs that they withdraw their complaint and predicted there would be countercharges against them — and, indeed, countercharges were made just days later when plaintiffs refused to withdraw their complaints. Management began monitoring and questioning plaintiffs' attendance, and refused to provide them with the tools necessary for them to perform their duties. Management and attempted to change their schedule to one that management knew plaintiffs would not be able to work. Ultimately, the plaintiffs were unable to perform their jobs and were each constructively discharged.

Defendant omits many of the facts in the record in its Motion for Summary Judgment. These omissions of material facts are tacit admissions that, when *all* of the evidence is viewed in a light most favorable to the plaintiff, genuine issues of material fact exist from which reasonable jurors could reasonably find that plaintiffs were subjected to a sexually hostile work environment, that defendant failed to take prompt effective remedial action to remedy the situation, and that plaintiffs were retaliated against and ultimately constructively discharged due to their repeated complaints about the sexually hostile work environment. Defendant's Motion for Summary Judgment must be denied.

## II. PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS

1. Uncontroverted.

2. Uncontroverted that the original defendants were State of Missouri Department of Corrections and Favorite Nurses. (See Complaint, Doc. No. 1). Plaintiffs have resolved their

case against Favorite Nurses under confidential terms. (See Joint Motion for Protective Order, Doc. No. 46). Only plaintiffs' claims against the Department of Corrections remain.

3.     Uncontroverted.

4.     Uncontroverted.

5.     Uncontroverted.

6.     Uncontroverted.

7.     Uncontroverted.

8.     Uncontroverted.

9.     Uncontroverted.

10.     Uncontroverted.

11.     Uncontroverted.

12.     Uncontroverted.

13.     Uncontroverted.

14.     Uncontroverted.

15.     Uncontroverted

16.     Controverted. Originally Jerry Curtit or his secretary Tina signed the time cards so that plaintiffs could then submit them to Favorite Nurses to be paid. (Ex. 2[1], Hunt depo. 53:2-54:9). Plaintiffs had no problem getting the time sheets signed during this time. (Ex. 2, Hunt depo. 57:10-13). However, after plaintiffs raised formal complaints of sexual harassment, the process changed and they had difficulty getting the time cards signed. (Ex. 2, Hunt depo. 54:5-

_____

[1]Plaintiffs have filed an Appendix of Unpublished Opinions and Exhibits with the Court. This Appendix contains all of the exhibits relied upon by plaintiffs except for those attached to Defendant's Motion for Summary Judgment.

55:13; (Ex. 1, Nurnberg depo. 106:6-10).  Sometimes it was Cline signed them, and sometimes it was Dave Dormire or Debbie Williams.  If no one was available, the submission of the time cards to Favorite Nurses was delayed and the plaintiffs were paid late.  (Ex. 2, Hunt depo. 54:5-55:13).  Plaintiffs had difficulty getting their time cards signed on a weekly basis after they made their formal complaints of sexual harassment in mid-April.  (Ex. 2, Hunt depo. 55:22-56:1).

17.     Uncontroverted.

18.     Uncontroverted.

19.     Uncontroverted.

20.     Uncontroverted.

21.     Uncontroverted.

22.     Uncontroverted.

23.     Controverted.  Plaintiffs were hired to work approximately twenty hours each, but shortly after they started, they began working approximately 30 hours per week.  (Ex. 2, Hunt depo. 52:12-53:1).  Additionally, Julie Ives promised plaintiffs that they would have full-time positions with the state if the position was successful.  (Ex. 2, Hunt depo. 51:11-24).

24.     Uncontroverted.

25.     Uncontroverted.

26.     Uncontroverted.

27.     Uncontroverted.

28.     Uncontroverted.

29.     Uncontroverted.

30.     Uncontroverted.

31.     Controverted.  It is uncontroverted that Seaman and Perry gave plaintiffs a tour of the facility, paired off the plaintiffs, followed them around, and leered at them.  However, defendant states these facts in the light most favorable to defendant although the rule requires the Court to view the evidence in the light most favorable to plaintiffs.  On the very first day of plaintiffs' employment at the Department of Corrections, Rodney Perry and Mitchell Seaman stayed with the plaintiffs constantly, paired off with Perry with Ms. Nurnberg and Seaman with Ms. Hunt, and stood uncomfortably close to the plaintiffs — so close, that if they would have moved, they would have been touching — followed them to the restroom, and rarely made eye contact, instead leering at their chests and looking at Ms. Hunt's behind.  (Ex. 1, Nurnberg depo. 41:18-22; 43:14-45:22; Ex. 2, Hunt depo. 59:21-62:23).

32.     Controverted.   Nurnberg did not complain to Seaman or Perry because she was uncomfortable and tense about their conduct.  (Ex. 1, Nurnberg depo. 45:22-46-25).  Ms. Hunt did not complain because she was intimidated by this conduct.  (Ex. 2, Hunt depo. 61:20-62:18).

33.     Uncontroverted.

34.     Controverted.  It is uncontroverted that plaintiffs did not use the words "sexual harassment" in this initial meeting.  However, plaintiffs told Ives in detail about what had happened — about the looks they received, the closeness of personal space, and the fact that Perry and Seaman made plaintiffs feel "very, very uncomfortable."  (Ex. 2, Hunt depo. 68:7-17).

35.     Controverted.  Ives does not remember speaking to Seaman about plaintiffs' complaints. (Ex. 3, Ives depo. 29:5-18).

36.     Uncontroverted.

37.     Controverted.  Perry continued to harass plaintiffs, and especially Ms. Nurnberg,

5

after he learned that Ms. Nurnberg had spurned his attention and that the plaintiffs had complained about him — he became hostile, unfriendly, gruff, demanding, and uncooperative to plaintiffs. (Ex. 2, Hunt depo. 82:7-14; 121:19-123:10; 127:22-128:8). On one occasion, shortly after the initial complaint, Perry demanded that both plaintiffs be fired. (Ex. 1, Nurnberg depo. 71:5-21). Seaman did much more than act "overly friendly" — his conduct never really changed and he continued to be around an awful lot. (Ex. 1, Nurnberg depo. 63:2-7). He was in the clinic whenever Ms. Hunt was there and engaged in inappropriate behavior nearly every day. (Ex. 1, Nurnberg depo. 66:22-67-13). These actions by Perry and Seaman are described in greater detail in paragraphs 66 through 79 of Statement of Additional Facts Precluding Summary Judgment.

     38. Uncontroverted.

     39. Uncontroverted.

     40. Uncontroverted.

     41. Uncontroverted.

     42. Uncontroverted.

     43. Uncontroverted.

     44. Controverted. It is irrelevant when plaintiffs initially contacted counsel. ***Carlyle v. Lai***, 783 S.W.2d 925, 929-30 (Mo.App. W.D. 1989) (reversible error to cross-examine and argue the timing of plaintiff's retention of counsel: "the right to seek the advice of counsel is so fundamental that, absent a justifiable reason and supporting evidence, counsel risk reversal when attempting to discredit a litigant by cross-examining him about the time and circumstances of his having consulted an attorney to discuss and exercise his legal rights").

     45. Uncontroverted.

### III.   STATEMENT OF ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT[2]

#### Employment Relationship with Department of Corrections

46.     Julie Ives contacted Ms. Nurnberg in late 1997, informed her about the position with the Department of Corrections, and interviewed both plaintiffs for the positions they ultimately held at the Department of Corrections.  (Ex. 1, Nurnberg depo. 22:13-24:22; 34:13-17).  It was Ms. Nurnberg who identified Ms. Hunt as a potential candidate for a position and took Becky to meet with Ms. Ives.  (Ex. 1, Nurnberg depo. 34:2-5; 34:13-17).

47.     Plaintiffs were "well respected and had good reputations" when they were hired. (Ex. 7 (Deposition Exhibit 61, Internal Affairs File, p. 12)[3]).  When Ives was asked during the investigation into plaintiffs' complaints of harassment why she believed plaintiffs had problems with Perry and Seaman, Ives claimed that the nurses "unfortunately have a history of this kind of behavior.  (Ex. 7, pp. 4-5).  When Dr. Schriro, the Director of the Department, later asked Ives why she had recommended them for the position if that was the case, Ives reversed herself and admitted that plaintiffs were "well respected and had good reputations" prior to the situation that arose with Perry and Seaman.  (Ex. 7, p. 12)).

---

[2]Due to the number of supervisors, human resources personnel, management  employees, and investigatory personnel involved in plaintiffs' complaints of sexual harassment, and the length of time plaintiffs were subjected to continuous harassment and retaliation, plaintiffs were required to take over twenty depositions and obtain hundreds of pages of documents from defendant including over 600 pages relating to defendant's investigation.  Plaintiffs have attempted to extract from this voluminous record only those facts necessary to demonstrate a few of the multiple factual issues precluding summary judgment.

[3]Where plaintiffs have cited voluminous deposition exhibits, such as Exhibit 61, they have referenced the specific pages supporting the facts set forth and have attached only those pages of the exhibits which are cited.

48.     As nurses, Plaintiffs could not lawfully provide any medical care beyond a nursing assessment without the authorization of a physician.  (Ex. 1, Nurnberg depo. 35:18-39-13).  This authorization can be accomplished either through written standing orders or standing protocols. (Ex. 3, Ives depo. 114:25-116:21).

## Department of Corrections Organization

49.     Dr. Dora Schriro has been the Director of the Department of Corrections since January 1993 and, is responsible for the overall direction of the department.  (Ex. 5, Schriro depo. 3:11-18).  She reports directly to the Governor.  (Ex. 5, Schriro depo. 10:4-19).

50.     Paul Herman and Chuck Franklin were the Deputy Director and the Assistant Deputy Director in 1998, respectively.  (Ex. 21, Lombardi depo. 10:14-16; Ex. 6, McKinney depo. 21:1-18).

51.     George Lombardi was the Director of Adult Institutions in 1998 and he reported to Franklin, Herman and Schriro. (Ex. 21, Lombardi depo. 3:4-18; 10:8-16; 13:6-10).

52.     Steve Long reported to Lombardi in 1998 and was the Assistant Director of Adult Institutions with responsibilities the Jefferson City Correctional Center.  (Ex. 21, Lombardi depo. 7:13-8:6).

53.     Dave Dormire is the superintendent of the Jefferson City Correctional Center where plaintiffs worked and he reported up the line to Long, Lombardi, Franklin, Herman and Schriro. (Ex. 4, Dearixon depo. 8:5-25).  In 1998, Dormire also supervised Arthur Dearixon, the investigator at Jefferson City Correctional Center.  (Ex. 4, Dearixon depo. 8:5-25).

54.     Jerry Curtit was the associate superintendent.  (Ex. 1, Nurnberg depo. 108:11-16).

55.     E.A. Grimes was the Inspector General over the Department of Corrections; he

reported to Franklin, Herman and Schriro and he supervised Edward Robinson and the Internal Affairs officers.  (Ex. 14, Robinson depo. 7:1-6).

56.     Alma McKinney was the Director of the Division of Human Services she reported to Franklin, Herman and Schriro.  (Ex. 21, Lombardi depo. 13:6-15:15).

57.     Julie Ives reported to Ms. McKinney in the Division of Human Services.  (Ex. 6, McKinney depo. 96:21-97:6)

### Previous Sexual Harassment Complaint Against Seaman

58.     A former female employee of defendant filed a sexual harassment complaint against Seaman in February 1997 because he spread an untrue rumor that she had been fired for engaging in oral sex with an inmate.  (Ex. 24, Documents relating to Prior Complaint Against Seaman, pp. 1-3).   An investigation occurred and, when confronted about the allegations, Seaman did not deny making such a statement, but did not remember making it.  (Ex. 24, pp. 12-15).  There were two independent witnesses who heard Seaman make the statement.  (Ex. 24, pp. 3-4).  However, there is no documentation indicating what the findings of the investigation were or whether Seaman received a letter of caution or additional sexual harassment training in light of these complaints.  (Ex. 24).

### Initial Harassment from Perry and Seaman

59.     The plaintiffs' job duties had nothing to do with the job duties of the Fire and Safety Specialists, Rodney Perry and Mitchell Seaman.  (Ex. 4, Dearixon depo. 63:18-64:3).  However, on the very first day of plaintiffs' employment at the Department of Corrections, Rodney Perry and Mitchell Seaman stayed with the plaintiffs constantly, paired off Perry with Ms. Nurnberg and Seaman with Ms. Hunt, and stood uncomfortably close to the plaintiffs — so close,

that if they would have moved, they would have been touching — followed them to the restroom, and rarely made eye contact, instead leering at their chests and looking at Ms. Hunt's behind. (Ex. 1, Nurnberg depo. 41:18-22; 43:14-45:22; Ex. 2, Hunt depo. 59:21-62:23).

60.     Ms. Hunt testified that Seaman

would stand as close to me as he possibly could without touching so that if I moved the slightest, I would back into his stomach. He was breathing down my neck. I could feel his breath on my neck.

(Ex. 2, Hunt depo. 62:20-23). Ms. Hunt was intimidated by Seaman's close proximity and his staring at her and Ms. Nurnberg's chest. (Ex. 2, Hunt depo. 61:20-62:18).

61.     Ms. Nurnberg was very uncomfortable and tense about their conduct. (Ex. 1, Nurnberg depo. 45:22-46-25).

62.     On the second day of employment, Perry and Seaman advised plaintiffs that they were going to make sure that one of them was in the institution whenever plaintiffs were. (Ex. 1, Nurnberg depo. 47:1-6;49:18-24). Ms. Nurnberg became concerned on the second day because Perry and Seaman were with them "constantly, absolutely all the time." (Ex. 1, Nurnberg depo. 53:22-54:9).

63.     Later in the day, Ms. Nurnberg told a supervisory employee, Marvin Cundiff, that she was concerned about Perry and Seaman being in the office with them, standing outside the bathroom door when they came out, and stated that they could not get Perry and Seaman to leave them alone. (Ex. 1, Nurnberg depo. 54:23-56:23). Mr. Cundiff said that Ms. Nurnberg looked upset and stated that Perry and Seaman had previously stated how much work it was going to be to supervise the nurses. (Ex. 1, Nurnberg depo. 54:23-55:22).

**Plaintiffs' Initial Complaint to Julie Ives**

64.     On the third or fourth day of employment with defendant, Ms. Nurnberg and Ms. Hunt went to Julie Ives and raised these concerns — telling Ives in detail about what had happened, telling her about the looks they received, the closeness of personal space, and the fact that Perry and Seaman made plaintiffs feel "very, very uncomfortable."  (Ex. 2, Hunt depo. 68:7-17; Ex. 1, Nurnberg depo. 57:4-21).  Ms. Hunt testified that she told Ives that

> these men are in our personal space, they're almost side to side, they're breathing down my neck.  Mitch Seaman in particular was the one that I was complaining about more.  Inappropriate sexual content -- comments were made, they would not leave us alone, they -- I explained to her about the bathroom situation, I explained that they were constantly with us.  And I also explained that it made me uncomfortable, that I felt intimidated by this man and that I wanted to know why -- you know, why were they need-- why did they have to be around us.

(Ex. 2, Hunt depo. 83:4-15).

65.     Ives testified that she told Perry to "back off" but could not remember speaking with Seaman.  (Ex. 3, Ives depo. 28:8-18).

## Continued Harassment by Seaman

66.     Seaman's conduct never changed and he continued to be around an awful lot.  (Ex. 1, Nurnberg depo. 63:2-7).  He was in the clinic whenever Ms. Hunt was there and engaged in inappropriate behavior nearly every day.  (Ex. 1, Nurnberg depo. 66:22-67-13).

67.     He  made numerous inappropriate sexually based behaviors and comments towards Ms. Hunt that both Ms. Nurnberg and Ms. Hunt were subjected to.  (Ex. 1, Nurnberg depo. 63:2-9).

68.     Seaman asked questions about Ms. Hunt's home life and love life, whether she had a boyfriend or a husband, made comments about Ms. Hunt's behind, and made comments about how she would look in a bathing suit.  (Ex. 1, Nurnberg depo. 63:13-64:17).

69.     One day, when the top button on one of Ms. Hunt's sweaters came loose, he made a comment to plaintiffs that she would look good if it just stayed unbuttoned.  (Ex. 1, Nurnberg depo. 63:18-22).

70.     He talked to Ms. Nurnberg about how he would like to see Ms. Hunt in a swimsuit.  (Ex. 1, Nurnberg depo. 64:23-65:3).

71.     He made a number of comments about his own sexual activity including one comment stating that he never had sex with his wife and another comment referring to sexual activity in which he stated that "he'd cleaned himself out over the weekend."  (Ex. 1, Nurnberg depo. 65:5-16).

72.     Seaman often commented on Ms. Hunt's body, made comments about how she would look in a particular dress, and comments that he was happy with the way she looked.  (Ex. 1, Nurnberg depo. 65:17-25).

73.     He was always looking Ms. Hunt over and standing behind her as close as he could.  (Ex. 1, Nurnberg depo. 65:25-66:1).

74.     He constantly would ask Ms. Nurnberg where Ms. Hunt was, or when she was coming in, and when she arrived, he would come up to the nurse's office.  (Ex. 1, Nurnberg depo. 66:2-9).

75.     One day, Seaman was standing behind Ms. Hunt, where she could not view him, with an erection that Ms. Nurnberg was able to observe.  (Ex. 1, Nurnberg depo. 66:10-13).  Ms. Nurnberg witnessed this and told Ms. Hunt about it.  (Ex. 1, Nurnberg depo. 140:16-141:3).

76.     Seaman made comments about how Ms. Hunt needed a man around the house and how he could fill that bill by doing things for her.  (Ex. 1, Nurnberg depo. 66:14:18).

**Continued Harassment by Perry**

77.     While Perry was not constantly around the plaintiffs after their initial complaint to Ives, he became hostile, unfriendly, gruff, demanding, and uncooperative to plaintiffs.  (Ex. 2, Hunt depo. 82:7-14; 121:19-123:10; 127:22-128:8).  He was also unfriendly, leaning toward hostile, to Ms. Nurnberg and was very uncooperative and curt in his discussions with her.  (Ex. 1, Nurnberg depo. 59:1-60:21).  When he saw plaintiffs, approximately a few times a week, he would glare at them with a disdainful look.  (Ex. 2, Hunt depo. 127:22-128-8).

78.     Shortly after the initial complaint to Ives, Perry demanded that both plaintiffs be fired.  (Ex. 1, Nurnberg depo. 71:5-21).

79.     On one occasion in the nurse's office, Perry was standing with a female co-worker in plaintiffs' presence and he had his hands on her buttocks.  Ms. Hunt found this offensive.  (Ex. 2, Hunt depo.130:11-22).

**Plaintiffs' Complaints about Sexual Harassment to Supervisors**

80.     A few weeks after plaintiffs started working at the Department of Corrections, Ms. Nurnberg and Ms. Hunt again met with Julie Ives and told her that they were still being sexually harassed.  (Ex. 1, Nurnberg depo. 68:18-69:5).  Ms. Nurnberg told Ms. Ives that she believed Perry's conduct was of a sexual nature; that he tried to get her fired and was hostile to her because she wouldn't have anything to do with him.  (Ex. 1, Nurnberg depo. 72:4-14).  Ms. Nurnberg also told Ives that Ives really needed to do something about the sexual harassment, that it was getting out of control and was affecting their jobs.  (Ex. 1, Nurnberg depo. 72:15-73:1).

81.     Ives responded that she had always found Perry so attractive, causing Ms. Nurnberg to reiterate what a serious problem this was.  (Ex. 1, Nurnberg depo. 57:4-21).

82. Ms. Ives had an obligation under defendant's policies to take action in response to plaintiffs' complaints. (Ex. 6, McKinney depo. 86:1-4). She never reported the complaints to Ms. McKinney, Mr. Dormire or anyone else and she never took any remedial action to stop the hostile behavior after she told Perry to "back off" in January.

83. In February 1997, Ms. Nurnberg and Ms. Hunt went to Major Eberle with her complaints because she had gotten nowhere with her complaints to Ms. Ives. (Ex. 1, Nurnberg depo. 99:4-99:16). Ms. Hunt used the term "sexual harassment" in this meeting. (Ex. 2, Hunt depo. 145:22-146:1).

84. When Ms. Ives found out about plaintiffs going to Eberle she shouted "Why did you involve that goddamn mother fucker Major Eberle," and hung up the phone on Nurnberg. (Ex. 1, Nurnberg depo. 99:17-101:1). Major Eberle heard this on the phone and suggested they meet with Mr. Dormire. (Ex. 1, Nurnberg depo. 101:3-5).

85. Eberle arranged a meeting that afternoon with Dormire, Jerry Curtit and the plaintiffs. (Ex. 1, Nurnberg depo. 101:6-9). Ms. Nurnberg and Ms. Hunt told Mr. Dormire, Mr. Curtit and Mr. Eberle that they were being sexually harassed. (Ex. 1, Nurnberg depo.101-10-102:15; Ex. 2, Hunt depo. 146:3-13). Ms. Nurnberg told Dormire that she had been sexually harassed by Perry and that he was retaliating against her because she had rejected his advances and was making it impossible for them to do their job. (Ex. 1, Nurnberg depo. 102:6-103:8).

86. Mr. Dormire ended the meeting by stating that he knew things were not going well and that he hoped to get that ironed out. However, he then said to the plaintiffs, "you are doing the program a lot of damage." (Ex. 1, Nurnberg depo. 104:10-105:6).

87. Later that night, as Ms. Nurnberg was leaving and eating a candy bar, she passed

14

Mr. Curtit who said "why don't you take that candy bar and shove it in your mouth to keep it quiet." (Ex. 1, Nurnberg depo. 126:9-25; Ex. 7 (Deposition Exhibit 61, pp. 47-48)).

### Plaintiffs' Complaints about Sexual Harassment to Human Resources

88.      In mid to late March, plaintiffs complained to Deborah Clay of Human Resources. (Ex. 2, Hunt depo.153:6-12). Ms. Clay's supervisor was Alma McKinney, the Director of Human Services. Plaintiffs told Ms. Clay about the sexual harassment that went on from day one and asked her to help stop the continued harassment. (Ex. 2, Hunt depo.154:10-155:21). Ms. Clay told the plaintiffs that she would talk to Alma McKinney and get back to them. Plaintiffs never heard from her again after that. (Ex. 2, Hunt depo.155:5-14).

89.      According to department director Alma McKinney, if plaintiffs raised complaints of sexual harassment in this meeting, Ms. Clay had an obligation to start an immediate investigation. (Ex. 6, McKinney depo. 47:11-48:25). Again, according to McKinney, Clay could not avoid the obligation to begin an investigation by recharacterizing plaintiffs' complaints as something other than "sexual harassment." (Ex. 6, McKinney depo. 49:1-8).

90.      Clay's memo dated May 18, 1998 — nearly two months after the meeting took place — reveals that Clay did attempt to recharacterize plaintiffs' complaints, thereby avoiding the obligation to start an investigation. (Ex. 7 (Deposition Exhibit 61, pp. 47-49)).

91.      On April 1, 1998, plaintiffs met with Ms. McKinney and complained to her about the sexual harassment they had experienced since the day they started, about their complaints to Ives and Dormire, about problems they were having getting their policies and procedures, and asked to have the continuing harassment stopped. (Ex. 2, Hunt depo. 157:6-159:8).

92.      Once these complaints were made, Ms. McKinney's demeanor changed and she

became less friendly.  (Ex. 2, Hunt depo. 159:9-12).  Regarding Perry and Seaman, Ms.

McKinney kept stating "that certainly is unprofessional behavior."  (Ex. 2, Hunt depo. 159:19-

20).  Ms. Hunt repeatedly responded, "no Alma, that is sexual harassment."  (Ex. 2, Hunt depo.

159:21-25).

93.     Without giving a specific time frame, Ms. McKinney stated that she would get

back to the plaintiffs.  (Ex. 2, Hunt depo. 159:25-160:5).

94.     Despite the fact that defendant's policy requires immediate action on sexual

harassment complaints and does not allow for any delay before requesting an investigation,

McKinney did not start an investigation and plaintiffs did not hear from Ms. McKinney for over

two weeks.  (Ex. 6, McKinney depo. 50:9-18; 54:1-24).

### Plaintiff's Formal Complaints of Sexual Harassment

95.     In mid-April, Ms. Nurnberg spoke to Dave Williams, an investigator under Arthur

Dearixon, about the hostile work environment while Mr. Williams was receiving a TB shot. (Ex.

1, Nurnberg depo. 144:13-21; Ex. 2, Hunt depo. 161:11-25; Ex. 4, Dearixon depo. 28:17-29:5).

96.     Mr. Williams went to Mr. Dearixon and the two started the formal complaint

procedure which included an interview, a formal written complaint, and an investigation by Mr.

Williams.  (Ex. 1, Nurnberg depo. 144:22-145:6; Ex. 2, Hunt depo. 162:15-21; Ex. 4, Dearixon

depo. 29:14-30:2; 33:11-24).

97.     Dearixon and Williams interviewed plaintiffs on April 14, 1998.  (Ex. 4, Dearixon

depo. 32:13-15).  The plaintiffs were emotional; they complained that they were being shadowed

by Perry and Seaman and stated that they had made many complaints before — to Ives, Dormire,

McKinney and Clay — but the complaints hadn't been followed up on.  (Ex. 4, Dearixon depo.

32:16-33:1).  Plaintiffs told Dearixon that they had been subjected to continued harassment and they thought that they were going to be fired for making a formal complaint.  (Ex. 4, Dearixon depo. 33:2-10).

98.     Dearixon issued written notices to Perry and Seaman that complaints of sexual harassment and harassment had been filed against them by Ms. Hunt and Ms. Nurnberg and issued them a direct order that they have no contact with the plaintiffs.  (Ex. 16 (Deposition Exhibit 13, Dormire File, pp. 315-16)).

99.     Upon the request of Dearixon and Williams, plaintiffs submitted their complaints in writing on April 16, 1998.  (Ex. 8, Hunt complaint (Deposition Exhibit 4); Ex. 9, Nurnberg complaint (Deposition Exhibit 5)).

100.     The allegations in the plaintiffs complaints, if true, were a violation of defendant's sexual harassment policy.  (Ex. 4, Dearixon depo.  68:3-15).

101.     On April 20, 1998, Ms. Nurnberg added a written complaint about Mr. Dormire after he attempted to get her to drop her formal complaint upon learning of it.  (Ex. 10, Nurnberg complaint (Deposition Exhibit 6)).  Dormire again told Ms. Nurnberg that she and Ms. Hunt were doing the program a lot of damage and he also warned her that Seaman and Perry would file complaints back against them.  (Ex. 10).

### First Investigation into Plaintiffs' Complaints

102.     After Williams investigated plaintiffs' complaints, he submitted a 35-page report to Mr. Dearixon on May 5, 1998, along with a 344-page binder of documents generated during this part of the investigation.  (Ex. 11, May 5, 1998, Williams Report of Investigation (Deposition Exhibit 3)); Ex. 4, Dearixon depo. 57:10-58:10).

17

103.     Dearixon then forwarded these materials to Dormire on May 7, 1998 with his own report.  (Ex. 4, Dearixon depo. 58:21-59:2;  Ex. 12 (Deposition Exhibit 2), Dearixon Report).

104.     Dearixon was not asked to make and made no finding regarding whether sexual harassment had occurred.  (Ex. 4, Dearixon depo. 60:14-61:11)

105.     Dearixon never found out from his superiors what follow-up action, if any, was undertaken or what determination was made concerning whether defendant's policies or the law relating to sexual harassment was violated. (Ex. 4, Dearixon depo. 61:19-63:2).

106.     Dearixon refused to investigate his supervisor, Dormire, and requested assistance in the investigation from Mike Payne, Chief Internal Affairs Officer for defendant.  (Ex. 13 (Deposition Exhibit 26, pp. 4-5); Ex. 12 (Deposition Exhibit 2)).

**Second Investigation into Plaintiffs' Complaints**

107.     On May 18, 1998, Edward Robinson of Internal Affairs was asked by Payne to do a follow up investigation into the plaintiffs' allegations — including an investigation into the actions of Clay, McKinney and Dormire after they received complaints from plaintiffs.  (Ex. 14, Robinson depo. 20:3-21:9; Ex. 7 (deposition exhibit 61, p. 4)).

108.     One tool used by Robinson in investigations in a CVSA — a computer voice stress analyzer.  (Ex. 14, Robinson depo. 25:8-11).  The CVSA is a device used to determine if the subject of the examination is being deceitful in responding to requests for information.  (Ex. 14, Robinson depo. 25:8-25).  The mere fact that a CVSA was requested indicates that the investigator, in this case Robinson, had reason to believe that the subject of the CVSA was being deceitful.  (Ex. 14, Robinson depo. 44:9-45:2).  Robinson conducted a CVSA on Ives, Perry and Seaman.  (Ex. 7 (Deposition Exhibit 61, pp. 4-11)).

109.     Robinson submitted a report to E.A. Grimes, the Inspector General, on June 4,

1998.  (Ex. 7 (Deposition Exhibit 61, pp. 4-11)).  In the report, Robinson summarizes his findings

and notes that the voice stress analysis tests on Ives, Perry and Seaman all "showed deception."

(Ex. 7 (Deposition Exhibit 61, p. 11))

110.     On June 5, 1998, Grimes forwarded the report to Dora Schriro, Director of the

Department of Corrections, with a memo stating, in part, the following:

> After reviewing this case and the information the investigators have collected, it is
> my opinion that there is some truth in what the nurses have reported.
> . . .
> Mr. Ives, Mr. Perry and Mr. Seaman were all administered truth verification
> examinations.  The examiner, Investigator Greg McKinney reported he found them
> all to be deceptive in answering relevant questions.  I cannot conclude the nurses
> were subjected to sexual harassment, *but I do believe that they were working and
> still are working in a less that [sic] favorable work environment.*  This is not to
> say the work environment is hostile; rather *I'm saying the work environment is not
> friendly*, there is little or no cooperation for them, small issues are blown out of
> proportion by all and the intended purpose of a good program is suffering because
> people don't want to work as a team.

(Ex.  7 (Deposition Exhibit 61, pp. 2-3)) (emphasis added).

111.     On June 8, 1998, in anticipation of receiving a final report from Grimes, Schriro

issued a memo, along with Grimes' June 5, 1998, report, to Paul Herman and Chuck Franklin, the

deputy director and the assistant deputy director, respectively, with recommendations to make

corrections and fix problems in the Department.  (Ex. 7 (Deposition Exhibit 61, p. 17)).

112.     On June 9, 1998, Grimes issued a final report on the investigation in light of

questions raised by Schriro.  (Ex. 7 (Deposition Exhibit 61, p. 12-16)).  This report included

plaintiffs' allegations that they were being harassed by Dormire who was checking up on them 10

to 15 times a day, but not speaking to them; he was also questioning the accuracy of their time

sheets and requiring them to sign in and out although others employees are not so required.  (Ex. 7 (Deposition Exhibit 61, p. 13)).  It was also noted that one of the plaintiffs had been followed home after completing a late shift and they are receiving mysterious phone calls where the caller hangs up.  (Ex. 7 (Deposition Exhibit 61, p. 13)).

113.    The report also noted that it had been confirmed that Curtit could not deny making the statement "why don't you take that candy bar and shove it in your mouth to keep it quiet." (Ex. 7 (Deposition Exhibit 61, p. 14)). He also stated, "I don't mean to sound like a chauvinist, but it sounds like a bunch of women sitting in there bitching about everything."    (Ex. 7 (Deposition Exhibit 61, p. 14)).

114.    Finally, the report also stressed that the computer voice stress analysis examinations showed that Ives, Perry and Seaman were not honest and forthcoming in response to the questions asked.    (Ex. 7 (Deposition Exhibit 61, p. 15)).  Ives showed deception when she denied that Hunt and Nurnberg reported sexual harassment, when she denied saying "God Damn you Susan," and when she said "Fuck You" to Ms. Nurnberg.  (Ex. 7 (Deposition Exhibit 61, p. 15)).  Seaman showed deception when he denied following Nurnberg and Hunt to the women's bathroom, when he denied making statements about Ms. Hunt's butt, and when he denied making sexual comments to Ms. Hunt.  (Ex. 7 (Deposition Exhibit 61, p. 15-16)).  Perry showed deception when he denied following Nurnberg and Hunt to the women's bathroom, when he denied telling Ms. Nurnberg to draw blood, and when he denied refusing to give incident and accident reports to the plaintiffs.  (Ex. 7 (Deposition Exhibit 61, p. 16)).

**Retaliation and Continued Harassment**

115.    After plaintiffs' initial complaints to Ms. Ives, they had problems getting

incident/accident reports from Perry and Seaman.  (Ex. 1, Nurnberg depo. 82:25-83:11).

116.     At one point after these complaints were reported to Ms. Ives and Ives told Perry to "back off," Perry became irate when Ms. Nurnberg refused to do an HIV test on an employee because she did not have a doctor's order allowing her to do so or the proper equipment.  (Ex. 1, Nurnberg depo. 86:10-89:13).  Perry told Ms. Nurnberg that she would be sorry if she didn't do it.  (Ex. 1, Nurnberg depo. 94:13-18).

117.     Although Ives promised plaintiffs that they would have the health files of the employees in the nurses' office when they started, plaintiffs did not receive them until after they filed a formal complaint with the investigators.  (Ex. 1, Nurnberg depo. 79:14-82:7; Ex. 23, Ives depo. Vol. II, 71:2-11).  Despite plaintiffs repeated attempts to get these health files so that they could adequately perform their jobs, they did not receive them until May 1998.  (Ex. 1, Nurnberg depo. 79:14-82:7; Ex. 6, McKinney depo. 100:4-11).

118.     After plaintiffs' complained to Ives, Ives never gave plaintiffs all of the necessary protocols to work under.  (Ex. 1, Nurnberg depo. 105:20-106:6; Ex. 3, Ives depo. 114:25-116:21).

119.     After plaintiffs made their formal complaint, Ms. Ives attempted to change plaintiffs' schedules by having Ms. Nurnberg report to work at 5:30am when Ives knew of Ms. Nurnberg's need to be at home in the morning to get her 14 year old daughter to school.  (Ex. 1, Nurnberg depo. 108:17-109:5).

120.     Immediately after plaintiffs made their formal complaint to the investigators, Dormire forwarded letters from Perry and Seaman with a request to "follow through with an investigation to see if [plaintiffs] are purposely lying."  (Ex. 4, Dearixon depo. 52:5-12; 52:21-24;

Ex. 15 (Deposition Exhibit 11,) Handwritten Note from Dormire and Memo from Perry; Ex. 22, Memo from Seaman).[4]

121.    After plaintiffs' formal complaint to the investigators, Ms. Hunt began having difficulty finding someone to sign plaintiffs' timesheets so that they could submit them to Favorite Nurses.  (Ex. 1, Nurnberg depo. 105:22-106:10; 113:5-8).

122.    After the plaintiffs made formal complaints to the investigators, Dormire asked Janice Schanzmeyer to keep track of the nurses' whereabouts, and ordered her not to talk to Dearixon about it.  (Ex. 4, Dearixon depo. 74:6-75:3; Ex. 16 (Deposition Exhibit 13, pp. 223-24)).  The personnel office began keeping track of plaintiffs' whereabouts by having employees sign a sheet of paper stating that the nurses were unavailable. Numerous employees were asked to sign documents indicating that plaintiffs were out of their work area.  (Ex. 16 (Deposition Exhibit 13, pp. 227-31)).   One employee, Sandra Webb, was asked to do this even though she knew the nurse was next door.  (Ex. 16 (Deposition Exhibit 13, pp. 227)).

123.    Jerry Curtit was nasty to Ms. Nurnberg and made rude remarks.  (Ex. 1, Nurnberg depo. 108:11-16).

124.    Items were stolen from the nurses' office.  (Ex. 1, Nurnberg depo. 108:2-7).

125.    Ms. Hunt became concerned for her safety after she was followed home from work one day.  (Ex. 2, Hunt depo. 100:12-101:23).  Both Ms. Nurnberg and Ms. Hunt began receiving hang-up calls at their homes after they made their formal complaints of harassment.  (Ex. 1, Nurnberg depo. 119:14-18; Ex. 2, Hunt depo. 103:12-104:2).

---

[4]Dormire had previously told Ms. Nurnberg that there would be a complaint made against her if she did not drop her complaint.  (Ex. 10, Nurnberg complaint (Deposition Exhibit 6)).

## Actions taken by Defendant

126.     On June 9, 1998, Steve Long, Assistant Director, wrote a memo to George Lombardi, Director of Adult Institutions, in which he discussed plaintiffs' allegations, supported Grimes' conclusion that the work environment is less than favorable, and suggested written direction.  (Ex. 17 (Deposition Exhibit 67, p. 1), Lombardi file; Ex. 18, Long depo. 15:17-25).

127.     On June 12, 1998, Lombardi wrote to Schriro and told her that he believed that Perry and Seaman, the Fire & Safety Officers, should receive a Letter of Caution and should be referred for sexual harassment training, that Curtit should receive a Letter of Reprimand and harassment training, and that Dormire receive a Letter of Caution or a verbal reprimand.  (Ex. 17 (Deposition Exhibit 67, p. 3-4).  A Letter of Caution is in the nature of a disciplinary action.  (Ex. 5, Schriro depo. 55:11-57:11).

128.     On June 16, 1998, McKinney wrote to Schriro and stated that she planned to issue a letter of reprimand to Julie Ives for inadequate supervision and for possibly using profanity in a conversation with Ms. Nurnberg.  (Ex. 19, (Deposition Exhibit 64, p. 31-32) Ives/McKinney file).  She agreed that letters of caution and training was appropriate for Perry, Seaman, and Curtit.  (Ex. 19, (Deposition Exhibit 64, p. 31-32)).  Finally, McKinney stated that the inaction on Dormire's part "would at a minimum merit a letter of caution."  (Ex. 19, (Deposition Exhibit 64, p. 31-32)).

129.     On June 23, 1998, McKinney sent a draft of a letter to Debra MacLeod, the Manager at Favorite Nurses, to Schriro to review in which she stated that:

> *The findings do not support blatant or pervasive acts of harassment or sexual harassment.  There appear to have been inappropriate comments (the intent is not known) that may have been made.*  Preventative measures in the form of corrective

action are being taken to address these issues.

(Ex. 19 (Deposition Exhibit 64, pp. 29-30)) (emphasis added).

130.     On June 29, 1998, despite the findings of the investigations and the recommendations for discipline that had been made, a revised version of McKinney's letter was sent to Ms. MacLeod which now stated that the results of the investigation *do not support a finding of harassment or sexual harassment."* (Ex. 20, June 29, 1998 Letter from McKinney).

131.     In that revised letter to Ms. MacLeod, McKinney also admitted that inappropriate comments may have been made and she represented that "preventative measures in the form of corrective action are being taken to address these issues." (Ex. 20).

132.     On July 1, 1998, Herman asked Lombardi and McKinney to report the dates of the meetings on which the individuals who had been identified for disciplinary action were held. (Ex. 17, (Deposition Exhibit 67, p. 5)).

133.     On July 2, 1998, Long asked Dormire to issue letters of caution to and conduct harassment training for Curtit, Perry and Seaman. (Ex. 17 (Deposition Exhibit 67, p. 5)). The discipline for Dormire which had been recommended by Lombardi and McKinney, was not mentioned. (Ex. 17 (Deposition Exhibit 67, p. 5)).

134.     On July 7, 1998, Schriro advised State Representative Quincy Troupe that

The investigation of sexual or other harassment resulted in a finding that inappropriate comments were probably made, but after an exhaustive review there was insufficient evidence that sexual or other harassment occurred. Precautionary steps through corrective actions and additional training are being taken to ensure that staff involved understand unprofessional behavior will not be tolerated.

(Ex. 19, (Deposition Exhibit 64, pp. 38-39)).

135.     On July 28, 1998, Dormire wrote Long refusing to issue discipline against Perry

24

and Seaman. (Ex. 13 (Deposition Exhibit 26, pp. 18-19)). Dormire alleged that the nurses engaged in false documentation of medical records and other acts of "irrational behavior," and lied many times. (Ex. 13 (Deposition Exhibit 26, pp. 18-19)). Dormire claimed that the nurses "have almost no credibility in their allegations" and complained that they were never investigated for making false claims under the policy. (Ex. 13 (Deposition Exhibit 26, pp. 18-19)).

136.    Long testified that he forwarded to Lombardi the memo in which Dormire refused to impose the discipline recommended by Lombardi along with Long's recommendation. (Ex. 18, Long depo. 19:24-20:6). Long cannot remember what his recommendation was and no record of this recommendation exists. (Ex. 18, Long depo. 19:24-20:6; 20:21-25; 21:17-21).

137.    Lombardi denied receiving Dormire's memo and he testified that he spoke to Long about the memo and Long did not remember seeing it either. (Ex. 21, Lombardi depo. 41:1-3; 79:11-82:13).

138.    Julie Ives was never disciplined for failing to take action in response to repeated complaints of sexual harassment, despite her having shown deception on the CVSA regarding plaintiffs' previous complaints of sexual harassment. (Ex. 6, McKinney depo. 94:3-7; Fact 114).

139.    Despite orders from McKinney, Grimes and Lombardi that Mitchell Seaman, Rodney Perry, Jerry Curtit, and Dave Dormire be disciplined, to this day, none of these men have ever been disciplined. (Ex. 13 (Deposition Exhibit 26, pp. 18-19); Ex. 21, Lombardi depo. 41:1-3; 81:20-82:13).

140.    Neither Ms. Hunt or Ms. Nurnberg ever learned the outcome of the investigation. (Ex. 6, McKinney depo. 67:22-69:5).

**Constructive Discharge**

141.     Ms. Hunt resigned on June 30, 1998, stating that she and Ms. Nurnberg were harassed on a daily basis, that it was allowed to continue and is still continuing, and that she "can no longer work in this hostile environment." (Ex. H to defendant's Motion for Summary Judgment, Hunt resignation letter). She also stated that the retaliation from the harassment complaint was horrendous, resulting in emotional and mental cruelty. (Ex. H to defendant's Motion for Summary Judgment).

142.     Ms. Nurnberg resigned on July 10, 1998, due to the continuing harassment and daily intimidation by Administration, stating that the hostile work environment makes it impossible to continue to be effective in her job. (Ex. I to defendant's Motion for Summary Judgment, Nurnberg resignation letter).

### Perry and Seaman's 1998 Performance Evaluations

143.     Despite the ongoing complaints of harassment and the time-consuming investigation that occurred, not only did Perry and Seaman never receive any discipline or additional sexual harassment training in light of their actions, they both received "highly successful" performance evaluations from Dormire for the time period that plaintiffs worked at the Department of Corrections. (Ex. 25, Seaman Performance Evaluation; Ex. 26, Perry Performance Evaluation).

# IV.    STANDARD FOR SUMMARY JUDGMENT

A moving party is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." ***Fed.R.Civ.P. 56(c).***  A defendant who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial.  ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).  When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences."  ***Comstock v. Consumers Markets, Inc.***, 953 F.Supp. 1096, 1099 (W.D.Mo. 1996).  At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. ***Anderson,*** 106 S.Ct. at 2511.  Summary judgment will not lie if a reasonable jury could return a verdict for the nonmoving party or if reasonable minds could differ as to the import of the evidence.  ***Id.*** at 2510-11.  Because discrimination cases often turn of inferences rather than on direct evidence, the court must be particularly deferential to the nonmovant.  128 F.3d 1201, 1205 (8th Cir. 1997).  The Eighth Circuit has cautioned that summary judgment should be used sparingly in employment discrimination cases:

> Summary judgments should be granted only in those rare instances where there is no dispute of fact and where there exists only one conclusion.  All of the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the nonmoving party.

***Hardin v. Hussmann Corp.,*** 45 F.3d 262, 264 (8th Cir. 1995).

## V.    ARGUMENT

The evidence in the record demonstrates that there are genuine issues of material fact on each factual issue plaintiffs are required to prove on their claims of a sexually hostile work environment and retaliation.  Defendant is not entitled to Summary Judgment.

### A.    Title VII Prohibits Defendant's Sexual Harassment of Plaintiffs

Defendant initially argues that because the plaintiffs were not actually employees of the State of Missouri Department of Corrections, they cannot sue the defendant under Title VII. Defendant relies on *Schwieger v. Farm Bureau Ins. Co. of Nebraska*, 207 F.3d 480 (8th Cir. 2000), which holds that Title VII protects employees, not independent contractors.

Defendant's reliance on *Schwieger* is misplaced.  Plaintiffs were employees of Favorite Nurses and were contracted to work at the State of Missouri, Department of Corrections using its tools and facilities and operated under at least some degree of supervision by defendant's employees.  Therefore, the controlling authority is a line of decisions beginning with *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973), which recognizes that a defendant who is otherwise an employer is liable under Title VII for its discriminatory acts toward a plaintiff if the defendant interferes with the plaintiff's employment opportunities with a third party and controls access to those opportunities.  *See also Diana v. Schlosser*, 20 F.3d 348, 350-51 (D.Conn. 1998).[5]

_____

[5]The *Diana* court analyzed the reasoning underlying *Sibley* rule in detail and traced cases in the *Sibley* line including *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1532 (11th Cir.1990);  *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir.1982); *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir.1988); *Doe on Behalf of Doe v. St. Joseph's Hosp.*, 788 F.2d 411, 422-23 (7th Cir.1986); *Gomez v. Alexian Bros. Hosp.*, 698 F.2d 1019, 1021 (9th Cir.1983); *Moland v. Bil-Mar Foods*, 994 F.Supp. 1061, 1073 (N.D.Iowa

Under Title VII, an employer is prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." *42 U.S.C. § 2000e-2(a)(1)*. An employee is defined as an individual employed by an employer. *42 U.S.C. § 2000e(f)*. The *Sibley* line of cases allow recovery by a plaintiff against a defendant who has subjected the plaintiff to discrimination or harassment notwithstanding the fact that she is technically not employed by the defendant based on the following reasoning:

> Control over access to the job market may reside, depending on the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access to any individual to employment opportunities otherwise available to her. *To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.*
> . . .
> A fair reading of the Act in light of its stated purposes precludes such a result.

*Sibley*, 288 F.2d at 1341 (emphasis added).

It does not appear that either the Eighth Circuit or this Court has ruled on this particular issue. However, at least three courts within the Eighth Circuit have adopted this theory. In *King v. Chrysler Corp.*, 812 F.Supp. 151, 153 (E.D.Mo.1993), the plaintiff was employed by an independent food services contractor which operated the cafeteria at defendant Chrysler's plant. The plaintiff claimed she was sexually harassed by an employee of Chrysler while she worked in the cafeteria and brought suit against Chrysler under Title VII. The court determined that the

1998); and *King v. Chrysler Corp.*, 812 F.Supp. 151, 153 (E.D.Mo.1993).

plaintiff could proceed against Chrysler under Title VII even though Chrysler was not her direct employer stating, in part, that

> [m]any courts reject the notion that Title VII requires a certain type of relationship between the defendant and a plaintiff suing under *42 U.S.C. § 2000e-2(a)(1)*. . . The statute does not specify that the employer committing the unlawful employment practice must employ the injured individual. If the Court were to accept Chrysler's position that it is not a proper defendant, Chrysler could allow a hostile work environment to exist because of the peculiar circumstances of its relationship with Canteen, although it could not do so if King were in its own service.

812 F.Supp. at 153 (citing *Sibley*, 488 F.2d at 1341).

In *Moland v. Bil-Mar Foods*, 994 F.Supp. 1061 (N.D.Iowa 1998), the plaintiff, an employee of IBP Corporation assigned to work at defendant Bil-Mar's processing plant weighing IBP trucks as they left Bil-Mar's plant, was sexually harassed by a Bil-Mar employee. After plaintiff complained to Bil-Mar about the harassment, Bil-Mar reprimanded the offending employee but asked IBP to reassign plaintiff to from Bil-Mar's scale house and the plaintiff was eventually terminated by IBP. The court denied defendant's motion for summary judgment, rejecting defendant's argument that no employment relationship existed.

Finally, most recently, Judge Carol E. Jackson of the United States District Court for the Eastern District of Missouri relied on the holdings of *Sibley*, *King* and *Moland* in denying defendant General Motors' motion for summary judgment in a case in which the plaintiff, an employee of co-defendant Junior College District of St. Louis, was assigned to work at General Motors and was subjected to a hostile work environment by General Motors employees and was ultimately constructively discharged. *Duncan v. Junior College District of St. Louis, et al.,* No. 4:98CV01220 (unpublished opinion November 15, 1999) (attached as Appendix A).

Clearly, Title VII does not allow defendant, who is undeniably an employer subject to Title VII, to avoid its obligations to maintain a discrimination-free work environment simply by contracting out some of its work. Indeed, the holdings in ***Sibley, King, Moland***, and ***Duncan*** make it clear that the broad remedial purposes of Title VII are best served by imposing liability against the defendant in this case.

**B.      There are Genuine Issues of Material Fact on Each Element of Plaintiffs' Claims of  Sexually Hostile Work Environment.**

It is well-settled that, in order to maintain a claim for hostile work environment sexual harassment by a co-worker under Title VII, an employee must establish the following:

(1)      she belongs to a protected group;

(2)      she was subjected to unwelcome sexual harassment;

(3)      the harassment was based on sex;

(4)      the harassment affected a term, condition, or privilege of employment;  and

(5)      her employer knew or should have known of the harassment and failed to take proper remedial action.

***Comstock***, 953 F.Supp. at 1096.[6]  In order for the alleged sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. ***Meritor Savings Bank, FSB v. Vinson***, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Whether an environment is "hostile" or "abusive" is determined by looking at several factors, including: "the frequency of the discriminatory conduct;

---

[6]To the extent defendant argues that there is some sort of burden shifting paradigm involved in analyzing sexual harassment cases, plaintiff disagrees with that. While defendant certainly may offer evidence at summary judgment that tends to demonstrate the events did not take place or were isolated or trivial, such "rebuttal" does not permit summary judgment where there is evidence from which a reasonable jury could find that sexual harassment did occur.

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ***Harris v. Forklift Systems, Inc.***, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview. ***Id.*** at 20-22, 114 S.Ct. at 370. However, the Eighth Circuit has made it clear that "once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." ***Howard v. Burns Brothers, Inc.***, 149 F.3d 835, 840 (8th Cir. 1998) *citing* ***Hathaway v. Runyon***, 132 F.3d 1214, 1221 (8th Cir. 1997). Finally, it is clear that the alleged acts need not be explicitly sexual in nature. *See e.g.* ***Gillming v. Simmons Industries***, 91 F.3d 1168, 1171-72 (8th Cir. 1996) (the predicate acts which support a hostile-environment sexual harassment claim need not be explicitly sexual in nature. . . [i]t is sufficient that members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed), and ***Hall v. Gus Construction Co., Inc.***, 842 F.2d 1010, 1014 (8th Cir. 1988) (intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances).

Obviously each plaintiff satisfies the first element of the hostile work environment claim — they are women. There is also sufficient evidence from which a reasonable juror could determine that the plaintiffs were subjected to unwelcome sexual harassment based on their sex that affected a term, condition, or privilege of employment and that defendant knew of the harassment but failed to take proper remedial action.

1. ***Ms. Hunt was subjected to unwelcome sexual conduct based on her sex that affected a term, condition, or privilege of her employment***

Beginning on the first day of her employment, Ms. Hunt was subjected to a hostile work environment by Mitchell Seaman. On that first day, he immediately paired off with her during the tour of the facility and made it clear, through his behavior, body language, and statements, that he was planning on spending a lot of time with Ms. Hunt. He stood so close she could feel his breath on her and, if she would have moved, she would have been touching him. He never made eye contact — instead leering at her breasts or her behind. He followed her to the bathroom continually and attempted to arrange his schedule so that he would always be with her while she was working. During the following months, he made numerous crude comments of a sexual nature regarding his own sexual activity, or lack thereof, regarding his desire to see Ms. Hunt in a swimsuit, regarding her body and her behind. He asked Ms. Nurnberg questions about Ms. Hunt's personal life and who she was dating. He was constantly with her — from the beginning of her employment until mid-April when she and Ms. Nurnberg made formal complaints of sexual harassment. On one occasion he was standing close to Ms. Hunt with an erection — an obvious indication that his conduct was "based on her sex."

This continuous conduct, which occurred from the first day of plaintiffs' employment, is clearly sufficient rise to the level of sexual harassment. *See e.g.* ***Rorie v. United Parcel Service, Inc.***, 151 F.3d 757, 762 (8th Cir. 1998) (we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law); ***Hathaway***, 132 F.3d at 1222 (plaintiff who was physically touched in a sexually suggestive and intimate manner on two occasions and coworkers laughed,

snickered, and made suggestive noises at her for a period of eight months made a submissible case of hostile work environment); and ***Howard***, 149 F.3d at 840 (one incident of unwanted physical contact and frequent, chronic sexual innuendos was sufficient to create a jury question of an offensive environment).

There can be no real dispute but that the conduct was unwelcome — Ms. Hunt and Ms. Nurnberg both complained about Seaman's behavior in the first week of their employment and continued making complaints throughout their employment to numerous supervisors and managers. Ms. Hunt testified that she found Seaman's conduct intimidating.

Finally, there is sufficient evidence from which a jury could determine that all of Seaman's conduct was based on sex — he made it clear from his actions that he was sexually interested in and aroused by Ms. Hunt. Thus, a male employee would not have been subjected to the constant attention, leers, physical closeness including an erection, and lewd comments to which Ms. Hunt was subjected.

"Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." ***Howard***, 149 F.3d at 840. These elements are met in this case and plaintiff Hunt has therefore presented sufficient evidence to withstand summary judgment on the first four elements of her claim of sexual harassment.

### 2. *Ms. Nurnberg was subjected to unwelcome sexual conduct based on her sex that affected a term, condition, or privilege of employment*

Ms. Nurnberg also has presented evidence that creates a factual issue as to whether she was subjected to a sexually hostile work environment. Rodney Perry paired off with Ms.

Nurnberg on the first day of employment. Like Seaman did to Ms. Hunt, Perry stayed so close to

Ms. Nurnberg that she could feel his breath on her, he followed her to the bathroom and he and

Seaman both stated that they would arrange their schedules to work with plaintiffs at all times.

Ms. Nurnberg was forced to listen to most of Seaman's lewd, sexual comments regarding Ms.

Hunt — comments about Ms. Hunt's butt, seeing her in a bathing suit, Ms. Hunt's personal life

and about his other sexual activity. Evidence of sexual harassment directed at employees other

than the plaintiff is relevant to show a hostile work environment. *Hall,* 842 F.2d at 1015 (citing

*Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415-16 (10th Cir. 1987)).

After Ms. Hunt and Ms. Nurnberg complained the first time to Julie Ives, Perry began a

pattern of hostile and abusive conduct towards Ms. Nurnberg as a result of her rejection of his

attentions. Perry was constantly rude to Ms. Nurnberg, within weeks of the complaint he asked

to have the plaintiffs fired, he failed to deliver necessary reports to the plaintiffs, thereby hindering

their ability to perform their job. This type of conduct, after Ms. Nurnberg's complained of

Perry's conduct is also evidence of a hostile and abusive working environment on the basis of sex.

*Hathaway*, 132 F.3d at 1222 (denying motion for JAML and holding that the jury could

reasonably have decided that plaintiff was the victim of menacing sex-based treatment that

stemmed from her rejection of [the accused harasser's] sexual interest in her).

Plaintiff Nurnberg continuously complained about the treatment by Seaman and Perry

beginning in the first week of her employment and continuing through the time of her formal

complaint of sexual harassment. She testified that she was intimidated by Perry. This clearly

indicates the unwelcomeness of the conduct.

Finally, the harassment was based on sex for the same reasons discussed above regarding

Ms. Hunt — a reasonable jury could determine that Perry's initial conduct was based on his sexual interest in Ms. Nurnberg and his subsequent acts of harassment were done due to his anger at being rejected by her.

### 3. *Defendant knew of the sexual harassment but failed to take proper remedial action.*

Defendant cannot make a serious argument that it took prompt remedial action. Defendant's witnesses admit that they had an obligation to take immediate action on plaintiffs' complaints. Julie Ives did not even talk to Seaman after plaintiffs' first complaint and took no action in response to several later complaints from the plaintiffs.[7] Mr. Dormire took no action after complaints were made to him. Neither Deborah Harris (Clay) nor Alma McKinney took any action after plaintiffs complained to them in March and April, respectively, despite the fact that they are the Human Resources representatives.

After the plaintiffs failed to get a satisfactory response from their supervisors and from human resources personnel, they made a formal complaint to the Department's investigative staff that was investigated twice. Despite investigations which revealed that the plaintiffs were telling the truth, that Ives, Perry and Seaman were lying, and that the plaintiffs were admittedly in an atmosphere that was "less than favorable," no remedial action was taken. Recommendations were made by Schriro and Grimes that discipline should be imposed and that sexual harassment training was necessary. McKinney represented to a state legislator and to Favorite Nurses that "corrective action" would be taken. However, this corrective action never took place. Dormire, in an act of defiance that makes plaintiffs' claims that he failed to respond to their complaints and retaliated

_____

[7]Despite these repeated failures to act in violation of defendant's sexual harassment policy, Ives was not subjected to any discipline for her conduct in this regard.

against them all the more credible, refused to impose the discipline he had been ordered to impose. His superiors simply overlooked this act of defiance. Defendant's investigation was neither prompt nor remedial as absolutely no corrective action was taken in response to plaintiffs' repeated complaints of sexual harassment and defendant's failure to correct it. It is clear that "the employer cannot avoid liability by doing nothing simply because the co-worker denies that the harassment occurred." *Delashmutt v. Wis-Pak Plastics, Inc.*, 990 F.Supp. 689, 697 (N.D.Iowa 1998) (J. Bennett) (citing *Hathaway*, 132 F.3d at 1222).

Both plaintiffs have demonstrated that genuine issues of material fact exist on each element of their claims of a sexually hostile work environment. Defendant's Motion for Summary Judgment should be denied.

**C.      Plaintiffs Have Demonstrated That Genuine Issues of Material Fact
         Exist on Each Element of Their Retaliation Claims**

To make a prima facie case of retaliation, plaintiffs must show that (1) they engaged in a protected activity; (2) that they suffered an adverse employment action; and (3) that adverse action occurred because of the protected activity. *Howard,* 149 F.3d at 841. Defendant does not dispute that plaintiffs meet the first element of the retaliation claim — they complained repeatedly to their supervisors, human resources employees and to the investigators that they were being sexually harassed and subjected to a sexually hostile work environment. Similarly defendant does not dispute that, if plaintiffs were subjected to an adverse employment action, they have satisfied the causation element. Thus, the sole question for summary judgment on the retaliation claim is whether there is sufficient evidence from which a jury could determine that plaintiffs suffered an adverse employment action.

Plaintiffs need not demonstrate an ultimate employment action, such as a demotion or termination, to demonstrate that they suffered an adverse employment action.  In ***Kim v. Nash Finch Co.***, 123 F.3d 1046, 1059-60 (8th Cir.1997), the Eighth Circuit rejected the defendant's argument that the plaintiff suffered no adverse employment action because he was not demoted, terminated, reassigned, or suspended, and did not lose any compensation or privileges, holding that "*serious employment consequences that affected or undermined [the employee's] position will be adverse employment actions*, even if the employee was not discharged, demoted or suspended."  Plaintiffs evidence easily meets this burden.  Defendant's repeated threats and actions taken to impede plaintiffs' ability to perform their jobs described herein are "more disruptive than a mere inconvenience or an alteration of job responsibilities" and are not the type of "changes in duties or working conditions that cause no materially significant disadvantage." *Id*. at 1060.

Other Eighth Circuit cases suggest that the second element of an adverse employment action requires proof of a *tangible* change in the employee's working conditions that produces a material employment disadvantage.  ***Cossette v. Minn. Power & Light***, 188 F.3d 964, 972 (8th Cir.1999).  A constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation.  ***West v. Marion Merrell Dow, Inc.***, 54 F.3d 493, 497 (8th Cir. 1995).  An employee is constructively discharged "when an employer deliberately renders the employee's working conditions intolerable and thus forces her to quit her job." ***Id. citing Smith v. World Ins. Co.***, 38 F.3d 1456, 1460 (8th Cir.1994).  In this case, there is evidence from which a reasonable jury could find that both plaintiffs were constructively discharged. *See e.g. **Coffman v. Tracker Marine, L.P.***, 141 F.3d 1241, 1246 (8th Cir. 1998)

39

(submissible case of retaliation where the supervisor who was the subject of complaints changed his demeanor and his relationship the plaintiff after the complaint).  The harassment and retaliation to which plaintiffs were subjected was ongoing.  Defendant's employees intentionally prevented plaintiffs from performing their job by repeatedly refusing to give them health files, protocols, accident reports, and other necessary tools.  Supervisory and management employees made threatening statements and orchestrated a campaign to monitor the plaintiffs' attendance and performance in an attempt to get them to quit.  In spite of their repeated complaints of harassment and retaliation, plaintiffs received no relief and were never told what action, if any, was being taken on their complaints.  Finally, after months of repeated harassment, both plaintiffs resigned due the stress of the environment and their justified fear of what would happen next.

The Ninth Circuit Court of Appeals recently revisited the issue of what constitutes an adverse employment action in *Ray v. Henderson*, 2000 WL 897778 (9th Cir., July 7, 2000) (copy of opinion included in Appendix as Exhibit B).  In *Ray*, the Ninth Circuit relied on the language of the anti-retaliation provision of Title VII and the EEOC Guidance on the subject and rejected, labeling it  "most restrictive," the approach taken by the Eighth Circuit which requires an ultimate employment action such as hiring, firing, promoting, or demoting to satisfy the standard.  *Ray*, 2000 WL 897778, p. 6 (*citing Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997)).  Under *42 U.S.C. § 2000e-3*, it is unlawful for an employer to discriminate against an employee in retaliation for engaging in protected activity.  The statute does not limit what type of discrimination is covered, and prescribes a minimum level of severity to trigger actionable discrimination.  *Id.* at p. 7.  The EEOC Guidelines interpret adverse employment action to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter

the charging party or others from engaging in protected activity." *Id*. at p. 6 (citing EEOC Compliance Manual Section 8, "Retaliation," p. 8008 (1998)[8] and **Meritor Savings**, 477 U.S. 57, 65 (1986) (EEOC Guidelines are not binding but they constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance)). This test, which covers lateral transfers, unfavorable job references, and changes in work schedules, most closely effectuates the letter and the purpose of Title VII. *Id.* at p. 7.

Plaintiff's research does not reveal any cases in which the Eighth Circuit has revisited the issue of what constitutes an adverse employment action since the EEOC standard was adopted in 1998. Plaintiff suggests this Court to adopt this standard, as the First, Seventh, Tenth, Eleventh, D.C., and now the Ninth Circuits have done. *Id.* at p. 5. The evidence of threats from superintendent Dormire and assistant superintendent Curtit, when coupled with the repeated intentional failures to provide plaintiffs with the necessary tools to perform their jobs and the numerous other acts of retaliation including monitoring plaintiff's attendance, easily meets this EEOC standard.

Under either of the tests employed by the Eighth Circuit in prior cases — and certainly under the EEOC Guidelines which have been adopted by several circuit courts — plaintiffs have demonstrated genuine issues of material fact on their claims of retaliation.

---

[8]A copy of the EEOC Compliance Manual Section 8 is included in the Appendix as Exhibit C.

## VI. CONCLUSION

This case is not appropriate for summary judgment. Defendant's argument that it is not liable for the sexual harassment and retaliation of its employees simply because plaintiffs were technically employed by another company — one that clearly had no ability to control plaintiffs' work environment — is contrary to a long line of case law and the public policy underlying the anti-discrimination laws.

There are numerous facts in dispute concerning the harassment and retaliation to which plaintiffs were subjected and defendant's obvious failures to take prompt remedial action. Despite repeated complaints by plaintiffs and despite recommendations for discipline from management level employees, no discipline was ever issued for violations of defendant's sexual harassment policy. Defendant's Motion should be denied.

THE MEYERS LAW FIRM

By: /s/ Martin M. Meyers
Martin M. Meyers          MO     #29524
*mmeyers@meyerslaw.com*
Stephen C. Thornberry     MO     #44354
*sthornberry@meyerslaw.com*
2850 City Center Square
1100 Main Street
Kansas City, Missouri 64105-2112
(816) 421-4040
(816) 421-4020 - Fax
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the above and foregoing was sent electronically this __13th__ day of July, 2000 to:

Sara L. Trower, Esq.
Virginia Hurtibuse Murray, Esq.
Assistant Attorney General
6th Floor, Broadway Building
P.O. Box 899
Jefferson City, Missouri 65102
Attorney for Department of Corrections.                    /s/ Martin M. Meyers