# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

REBECCA HUNT, et al.,                )
                                     )
    Plaintiffs,          )
                                     )   Case No. 99-4158-CV-C-5
v.                                   )
                                     )
STATE OF MISSOURI, DEPARTMENT        )
OF CORRECTIONS, et al.,              )
                                     )
    Defendants.          )

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS AND DEFENDANT'S RESPONSE TO PLAINTIFF'S ADDITIONAL FACTS**

Neither plaintiff's response to defendant's statement of facts nor plaintiff's statement of additional facts preclude the granting of defendant's motion for summary judgment. Even if some facts are disputed by the parties, these facts are not "material facts" and, as a result, defendant is entitled to summary judgment as a matter of law. Moreover, as stated in defendant's reply suggestions, plaintiff's admit that they were not defendant's employees. Plaintiffs' independent contractor status prevents them from making valid Title VII claims against defendant.

**A. Defendant's Reply to Plaintiff's Response to Defendant's Statement of Facts**

16. Admit that plaintiffs Hunt and Nurnberg testified as indicated in the portions referenced in their response. Denied that they had difficulties getting their timesheets signed after making complaints about sexual harassment. Donald Cline testified that the nurses did not make him aware of any problems with obtaining signatures for their time sheets until they indicated they were resigning. (Ex. N, Cline depo. pp. 8, line 23 through pp. 9, line 8.)

23. Admit that Hunt testified as stated.

32. Admit that in a portion of Nurnberg's deposition testimony she states that she was "very uncomfortable" and "stressed out."[1] Nurnberg, in the same exchange of questioning in the deposition, also states:

---

[1] Exhibit K (Nurnburg Depo attached hereto) at 46, lines 24-25.

> Q: At any point in that first day did you tell either Mr. Perry or Mr. Seaman that they were making you uncomfortable?
> A: No.
> Q: Why not?
> A: It was the very first day and I didn't want to start off on a bad foot right off the bat.
> Q: At any time during that first day if Mr. Perry and Mr. Seaman were making you uncomfortable, why didn't you go to talk to Mr. Dormire about it?
> A: Probably because I was pretty stressed about it at that point and I didn't even think about doing that.
> Q: You know, most people if somebody's bugging them, tell them, Hey, bug off or stop it, or whatever. I mean, that's the sensible thing that most people do. Why didn't you do that?
> A: Why didn't I tell them? Probably because I was too polite to say that to them because I wanted to really assess what was going on.[2]

34. Admit Hunt testified that she told Julie Ives about the looks, closeness of personal space, and feeling very uncomfortable.

37. Deny Rodney Perry continued to harass plaintiffs, "especially Nurnberg," after she "spurned" his attention. Admit Hunt testified, in response to a question about Perry's behavior after plaintiffs' first conversation with Julie Ives regarding Perry and Seaman, that Perry was in the plaintiffs' nursing office "less and less. It - from what started as constantly to our side, went to, you know, passing in the hall two - two - maybe two to three times a week perhaps. But when he was in there, he wasn't at our side constantly while we were - during our work shift, during our shift."[3] In the same exchange, Hunt also testified as follows:

> Q: After you complained to Ms. Ives about Mr. Perry and before you filed your complaint with the investigator in the middle of April, did Mr. Perry engage in any kind of harassing conduct directed toward you?
> A: Toward me?
> Q: Yes.
> A: Other than glares, not speaking, you know, when - you know, when you pass in the hall, that type of thing, no.
> Q: When you say "glares," are those the kind of glares that occured in those first two days where he's glaring at your chest, or is this the glare that would indicate to you that he's not happy with you or doesn't like you? Is there a distinction when you use the word "glare" there?

---

[2] *Id*. at 45-46, lines 23-21.

[3] Exhibit L (Hunt Depo attached hereto) at 128, lines 3-8

> A: There's a distinction. When I -- when I talk about the men
> looking at our chest as I'm watching - as I'm - as I'm looking
> at this, you know, no eye contact and when a man - any little
> bit of a look that you did get prior to, you know, the harassment -
> letting her know about the harassment in the beginning, the
> kind of look was as - is - it's as though the - both men, not
> just one man, but both men were undressing you with their
> eyes. That's the kind of look. The glare that I described later
> is dislike, disdain glare and - you know, glare. There was a
> difference.
> Q: Okay. And in those contacts with Mr. Perry after you complained
> to Julie Ives about him, did he ever do anything which you
> found to be offensive in a sexually suggestive nature?
> A: With Rodney Perry?
> Q: Yes.
> A: To me?
> A: Yes.
> Q: No.

Hunt was also asked if she ever saw Perry engage in "offensive conduct" toward Nurnberg after plaintiffs' first conversation with Julie Ives about Perry and Seaman, and in response Hunt testified that "other than at times there were telephone conversations where I was in the room, you know, it sounded like it wasn't a cordial conversation. Other than that, no."[4]

Admit Hunt testified that Perry became hostile, unfriendly, gruff, demanding, and uncooperative to plaintiffs. Admit Nurnberg testified that Perry demanded plaintiffs be fired. Admit that Nurnberg testified that Mitch Seaman "never really changed" after plaintiffs' first meeting with Julie Ives about Perry and Seaman. Admit Nurnberg testified that Seaman was in the plaintiffs' nursing clinic "just about every day, every other day at times." Admit Nurnberg testified that Seaman made "one to two, if not more" comments that Nurnberg believes were of a sexually harassing nature when Seaman came into the plaintiffs' nursing clinic.

44. Plaintiffs' statement in fact 44 is a legal conclusion requiring no response by defendant.

**B. Defendant's Response to Plaintiff's Statement of Additional Facts**

46. Admit Nurnberg testified as stated.

---

[4] *Id.* at 131, lines 2-11.

47. Admit that the internal affairs memo from Ercell Grimes to Dora Schriro referenced by plaintiffs states that Julie Ives said the nurses were well respected and had good reputations.

48. Admit.

49. Admit.

50. Admit.

51. Admit.

52. Admit.

53. Admit.

54. Admit that Curtit is a former Associate Superintendent at JCCC.

55. Admit.

56. Admit.

57. Admit.

58. Admit plaintiffs' Exhibit 23 is a memorandum from Arthur Dearixon to David Williams dated February 21, 1997, regarding an internal investigation involving statements allegedly made by Seaman about C.O. I Lee Ann Ely. Dearixon's memorandum speaks for itself.

Deny "two independent witnesses" heard Seaman make the statement. Plaintiffs' Exhibit 23 indicates that during an investigation, one witness, C.O. I Bays, said he heard Seaman make the statement.[5] Bays also said C.O. I Burns and C.O. I Berry were sitting nearby.[6] Both Burns and Berry denied or did not recall hearing the alleged statement by Seaman regarding Ely.[7]

59. Admit Investigator Arthur Dearixon testified that he "thought" that plaintiffs' duties at Jefferson City Correctional Center had nothing to do with the duties of Perry and Seaman. However, what the investigator who was never involved in the planning, design, implementation or day to day operation of the employee health nurse program "thought" after the

---

[5] Plaintiffs' Exhibit 24 at 16-17.

[6] *Id.*

[7] *Id.* at 18-21.

fact is irrelevant. Julie Ives who was involved in the planning, design, implementation and day to day workings of the employee health nurse program from the beginning, testified that since the fire and safety guys look at the accidents and how they occur, they would work together with the employee health nurses in an attempt to reduce workers' compensation costs. (Ex. M, Ives deposition pp. 16, line 19 through pp. 17, line 22.)

60. Admit Hunt testified as stated.

61. Admit Nurnberg testified as stated.

62. Admit Nurnberg testified as stated.

63. Admit Nurnberg testified as stated.

64. Admit Hunt and Nurnberg testified as stated.

65. Admit.

66., 67, and 68. Admit Nurnberg testified as stated. Deny, however, that the events actually occurred. Mr. Seaman testified that "they were the ones that discussed their personal life" and that every time he went up there "they were having some kind of problem with their personal life." (Ex. O, Seaman depo. pp. 34, line 2 through pp. 37, line 9.) Mr. Seaman never had any conversation with Hunt or Numberg in which he made any reference to their behinds, fannies, butts or any other word referring to the same part of the anatomy. (Ex. O, Seaman depo. pp. 40, line 4-8.)

69. Admit Nurnberg testified as stated.

70. Admit Nurnberg testified as stated. Deny that the conversation actually occurred. Mr. Seaman denied having any discussion about wanting to see Becky Hunt in a bathing suit. (Ex. O, Seaman depo. pp. 39, line 25 through pp. 40, line 3).

71. Admit Nurnberg testified as stated.

72. Admit Nurnberg testified about Seaman's alleged comments regarding Hunt's appearance.

73. Admit Nurnberg testified as stated.

74. Admit Nurnberg testified that Seaman would ask her about Hunt's whereabouts, when Hunt was coming to work, and that Seaman would go to plaintiffs' nursing office.

75. Admit Nurnberg testified as stated.

76. Admit Nurnberg testified as stated.

77. Admit Perry was not constantly around plaintiffs after plaintiffs' first conversation with Julie Ives about Perry and Seaman. Admit Hunt testified as stated in the remainder of paragraph 77.

78. Admit Nurnberg testified as stated.

79. Admit Hunt testified as stated.

80. Admit Nurnberg testified as stated.

81. Admit Nurnberg testified as stated.

82. Admit McKinney testified as stated in plaintiff's referenced Ex.6 at depo. 86:1-4. The remainder of this paragraph is controverted because it fails to cite to any testimony or documentation and thus fails to comply with the summary judgment rule.

83. Admit that Nurnberg testified as stated.

84. Admit Nurnberg testified as stated regarding the telephone conversation. Admit Major Eberle escorted plaintiffs to Superintendent Dormire's office.

85. Admit Major Eberle escorted plaintiff's to Superintendent Dormire's office. Deny that plaintiffs told Eberle they were being sexually harassed by Perry and Seaman.

Admit Nurnberg and Hunt testified that they told Dormire, Curtit, and Eberle that they were being sexually harassed by Perry and Seaman.

Admit Nurnberg testified that she told Dormire she had been sexually harassed by Perry in the beginning of her work, that Perry subsequently became very hostile, and that it was impossible for plaintiffs to do their job.

86. Admit Nurnberg testified as stated.

87. Misstates Nurnberg's deposition testimony at 126-27, lines 7-1.

88. Admit Hunt testified as stated.

89. Admit McKinney testified as stated.

90. Admit plaintiffs' Exhibit 7, pp 47-49, is a memorandum to Alma McKinney from Deborah Clay dated May 18, 1998. The memorandum speaks for itself. The remainder of the paragraph is an inappropriate characterization of the memorandum's contents.

91. Admit Hunt testified as stated.

92. Admit Hunt testified as stated.

93. Admit Hunt testified as stated.

94. Deny as the paragraph is an improper argument and conclusion and also misstates Ms. McKinneys testimony in which she stated that when she met with Hunt and Nurnberg on April 1 she asked them multiple times whether they had been sexually harassed and they responded no. (Plaintiff's Ex. 6, McKinney depo. pp. 39:7-16.)

95. Admit Nurnberg, Hunt, and Dearixon testified as stated.

96. Admit Nurnberg, Hunt, and Dearixon testified as stated.

97. Admit plaintiffs were interviewed on April 14, 1998. Admit Dearixon testified as stated in the remainder of paragraph 97.

98. Admit.

99. Admit plaintiffs submitted written complaints to Arthur Dearixon. Admit plaintiffs' Exhibit 8 and plaintiffs' Exhibit 9 are their written complaints. Plaintiffs' complaints speak for themselves.

100. Admit Dearixon testified as stated.

101. Admit Nurnberg wrote Dearixon a memorandum on April 20, 1998. Admit plaintiffs' Exhibit 10 is Nurnberg's memorandum. Admit Nurnberg's memorandum contains the statements referenced in the remainder of paragraph 101.

102. Admit.

103. Admit.

104. Admit.

105. Admit.

106. Admit plaintiffs' Exhibit 12 contains the statement "the JCCC Investigative Unit declines to interview Mr. Dormire since he is their immediate supervisor." Admit that in plaintiffs' Exhibit 13 the assistance of Mike Payne is requested after Perry filed a cross-complaint with the investigative unit alleging he was falsely accused by plaintiffs.

107. Admit that on May 18, 1998, Edward Robinson was asked by Mike Payne to investigate plaintiffs' complaint against Perry and Seaman. Admit that Clay, McKinney, and Dormire were interviewed in the course of the investigation.

108. Admit Robinson testified as stated.

109. Admit plaintiffs' Exhibit 7, pp 4-11, is a memorandum to E.A. Grimes from Ed Robinson dated June 4, 1998. Admit Robinson's memorandum refers to deception by Ives, Perry, and Seaman on some of the questions asked of them during CVSA examinations.

110. Admit plaintiffs' Exhibit 7, pp 2-3, is a memorandum to Dora Schriro from Ercell A. Grimes dated June 5, 1998. Admit Grimes' memorandum includes the information contained in paragaph 110 regarding Ives, Perry, and Seaman being administered CVSA examinations. Admit Grimes' memorandum states "after reviewing this case and the information the investigators have collected, it is my opinion that there is some truth in what the nurses have reported." Admit that the same paragraph of Grimes' memorandum continues:

> the nurses reported the fire and safety specialists made statements that the nurses would be supervised by them. While there was nothing ever put in writing to that effect and no one in management recalls ever making any statements to that effect, Mr. Marvin Cundiff reported to the investigator he overheard Mr. Rodney Perry telling several people in Mr. Cline's secretary's office, he, Perry, would be supervising the nurses when they arrived at JCCC. I found that there were strong indicators the fire and safety specialists attempted to exercise supervision over the nurses.

111. Admit plaintiffs' Exhibit 7, pp 17, is a memorandum from Dora Schriro to Paul Herman and Chuck Franklin dated June 8, 1998. The content of Schriro's memorandum speaks for itself.

112.    Admit plaintiffs' Exhibit 7, pp 12-16, is a memorandum to Dora Schriro from Ercell A. Grimes dated June 9, 1998. Admit Grimes' memorandum includes statements allegedly made by plaintiffs and other persons. The content of Grimes' memorandum speaks for itself.

113.    Admit Grimes' memorandum referenced in paragraph 112 states that Curtit "may have made the statement . . . " Admit Grimes' memorandum contains the remaining statement attributed to Curtit.

114.    Admit Grimes' memorandum referenced in paragraph 112 refers to Ives, Perry, and Seaman not being honest and forthcoming in response to some questions that were asked during CVSA examinations.

115.    Admit Nurnberg testified as stated.

116.    Admit Nurnberg testified as stated.

117.    Admit Julie Ives testified that in the "December '97, January February '98" timeframe, the employee health files were not in plaintiffs' nursing clinic. Admit Ives testified that the files should have been moved to the clinic during that timeframe.[8] Admit McKinney testified that she "believes" the health files were moved into the clinic in May 1998.[9]

118.    Admit plaintiffs had standing orders (protocols) to perform TB testing. Admit Julie Ives attempted to get plaintiffs additional standing orders from a Dr. McNally. Admit Nurnberg also attempted to get standing orders from Dr. McNally.[10]

119.    Admit Nurnberg testified as stated.

120.    Admit Perry and Seaman filed written requests that plaintiffs be investigated for making false accusations against them. Admit Superintendent Dormire forwarded Perry and Seaman's request to the JCCC investigators office.[11] Admit Nurnberg wrote a memorandum to Arthur Dearixon dated April 20, 1998, plaintiffs' Exhibit 10, in which Nurnberg states that "he,

---

[8]    Plaintiffs' Exhibit 23 at 71, lines 2-7.

[9]    Plaintiffs' Exhibit 6 at 100, lines 4-11.

[10]   Plaintiffs' Exhibit 3 at 116-17, lines 4-25.

[11]   Plaintiffs' Exhibit 4 at 52; Plaintiffs' Exhibit 15; Plaintiffs' Exhibit 22.

Dormire, stated that because of this Fire & Safety here would make accusations against Becky and myself, and it would go on and on for months."

    121.    Admit Nurnberg testified as stated.

    122.    Admit that the Personnel Office attempted to keep track of plaintiffs' hours in order to determine what working hours would best suit JCCC staff seeking medical attention at plaintiffs' nursing clinic.[12]  Admit Dearixon testified that he contacted Janice Shanzmeyer and Superintendent Dormire about this issue.

Admit some employees signed statements indicating plaintiffs were not in the nursing clinic when the employees sought medical assistance.[13]

Admit C.O.I Webb wrote a memo to Major Eberle dated June 25, 1998, plaintiffs' Exhibit 16 at 227.  Webb's memorandum speaks for itself.

    123.    Admit Nurnberg testified as stated.

    124.    Admit Nurnberg testified as stated.

    125.    Admit Hunt and Nurnberg testified as stated.

    126.    Admit plaintiffs' Exhibit 17, pp 1, is a memorandum from Steve Long to George Lombardi dated June 9, 1998.  Long's memorandum speaks for itself.

    127.    Admit plaintiffs' Exhibit 17, pp 3-4, is a memorandum from George Lombardi to Dora Schriro dated June 12, 1998.  Lombardi's memorandum speaks for itself.

    128.    Admit plaintiffs' Exhibit 19, pp 31-32, is a memorandum from Alma McKinney to Dora Schriro dated June 16, 1998.  McKinney's memorandum speaks for itself.

    129.    Admit plaintiffs' Exhibit 19, pp 29-30, is an unsigned letter from Alma McKinney to Debra MacLeod of Favorite Nurses dated June 23, 1998.  McKinney's unsigned letter speaks for itself.

    130.    Admit plaintiffs' Exhibit 20, pp 25-26, is a letter from Alma McKinney to Debra MacLeod of Favorite Nurses dated June 29, 1998.  McKinney's letter speaks for itself.

---

[12]    Plaintiffs' Exhibit 16 at 223-24.

[13]    *Id.* at 228-31.

131. Admit plaintiffs' Exhibit 20, pp 25-26, is a letter from Alma McKinney to Debra MacLeod of Favorite Nurses dated June 29, 1998. McKinney's letter speaks for itself.

132. Admit plaintiffs' Exhibit 17, pp 2, is a memorandum from Paul Herman to George Lombardi and Alma McKinney dated July 1, 1998. Herman's memorandum speaks for itself.

133. Admit plaintiffs' Exhibit 17, pp 5, is a memorandum from Steve Long to Superintendent Dormire dated July 2, 1998. Long's memorandum speaks for itself.

134. Admit plaintiffs' Exhibit 19, pp 38-39, is a letter from Dora Schriro to Representative Quincy Troope dated July 7, 1998. Schriro's letter speaks for itself.

135. Admit plaintiffs' Exhibit 13, pp 18-19, is a memorandum from Superintendent Dormire to Steve Long dated July 28, 1998. Deny that in this memorandum Dormire "refuses" to discipline Perry and Seaman. Dormire's memorandum speaks for itself.

136. Admit Steve Long testified that he forwarded Superintendent Dormire's July 28, 1998, memorandum to George Lombardi. Admit Long testified that he does not recall what his recommendation was and cannot find a written recommendation regarding Dormire's memorandum.

137. Admit Lombardi testified as stated.

138. Ives was disciplined by Alma McKinney for using profanity and failure to adequately supervise the nurses. She was not disciplined for failing to respond to the sexual harassment complaints because the investigation concluded that the complaints of sexual harassment could not be substantiated. (Plaintiff's Ex. 6, McKinney depo. pp. 87:12-19; 93:21--95:14).

139. Deny Alma McKinney or Grimes "ordered" disciplinary action against Perry, Seaman, Curtit, and Dormire as the plaintiff's references to the record do not support this statement.

140. The paragraph misstates Ms. McKinney's testimony in which she states that under policy she would not have been allowed to reveal whether disciplinary action was taken against an employee as a result of the investigation.

141. Admit defendants' Exhibit H is a resignation memorandum from Hunt dated June 30, 1998. Hunt's memorandum speaks for itself.

142. Admit defendants' Exhibit I is a resignation memorandum from Nurnberg dated July 10, 1998. Nurnberg's memorandum speaks for itself.

143. Admit that Perry and Seaman received "highly successful" performance evaluations. Deny the remainder of this paragraph as the referenced citation to the record by plaintiff fails to support this statement and it thus fails to comply with the summary judgment rule.

**C.   Defendant's Statement of Additional Undisputed Material Facts**

1. Deborah MacLeod, Vice President of Favorite Nurses, testified that after learning that plaintiffs were resigning their positions at Favorite Nurses, she spoke with Nurnberg about reassigning Nurnberg to another job site.[14] MacLeod asked plaintiffs about working at job sites in Kansas City, St. Louis, or the Lake of the Ozarks regions.[15]

2. On June 16, 1998, Hunt gave Deborah MacLeod a two week resignation notice. MacLeod testified that Hunt informed her that she, Hunt, had already found another job outside of Favorite Nurses.[16] Hunt testified that her new job was at the Division of Medical Services and she began working there within "a couple of days."[17]

3. Deborah MacLeod testified that David Lite, Human Resource Director for Favorite Nurses, wrote Nurnberg a letter dated July 18, 1998, referring Nurnberg for work to one of Favorite Nurses local offices and giving Nurnberg the local office addresses and telephone numbers.[18]

---

[14]   Exhibit J (MacLeod Deposition attached hereto) at 106-108.

[15]   *Id.*

[16]   *Id.* at 92.

[17]   Exhibit L (Hunt Depo attached hereto) at 88.

[18]   Exhibit J (MacLeod Depo attached hereto) at 111-12.

4. Plaintiffs have consistently been employed in the nursing field since they resigned their positions at Favorite Nurses.[19]

Respectfully submitted,

JEREMIAH W. (JAY) NIXON
Attorney General

/s/ Virginia Hurtubise Murray

VIRGINIA HURTUBISE MURRAY
Missouri Bar No. 48770

/s/Sara L. Trower

SARA TROWER
Missouri Bar No. 48770

Assistant Attorneys General
P.O. Box 899
Jefferson City, Missouri 65102
Phone: (573) 751-3321
Fax: (573) 751-9456

ATTORNEYS FOR DEFENDANT
STATE OF MISSOURI, DEPARTMENT
OF CORRECTIONS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically served this 24th day of July, 2000, to: Martin Meyers and Stephen C. Thornberry of The Meyers Law Firm, 2850 City Center Square, 1100 Main Street, Kansas City, Missouri 64105-2112.

/s/ Sara L. Trower
Assistant Attorney General

---

[19] Exhibit K (Nurnberg Depo attached hereto) at 12-16; Exhibit L (Hunt Depo attached hereto) at 25-32; 87-88.