```
 1              IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                     WESTERN DIVISION

 3    REBECCA HUNT and
      SUSAN A. NURNBERG,
 4
                       Plaintiffs,
 5
      vs.                          Case No. 99-4158-CV-C-5
 6
      STATE OF MISSOURI
 7    DEPARTMENT OF CORRECTIONS,
      and FAVORITE NURSES, INC.,
 8
                       Defendants.
 9
                    VIDEOTAPED DEPOSITION OF DEBRA
10    MACLEOD, a witness, taken on behalf of the
      Plaintiffs, pursuant to Notice, on the 25th day of
11    February, 2000 at the law offices of Spencer, Fane,
      Britt & Browne, LLP 9401 Indian Creek Parkway,
12    Overland Park, Kansas before

13                  SANDY RIDER, CSR

14    of AAA Reporting Company, a Certified Shorthand
      Reporter of the State of Kansas.
15

16                     APPEARANCES

17         For the Plaintiffs:
                Mr. Martin M. Meyers
18              THE MEYERS LAW FIRM
                1100 Main Street, Suite 2850
19              Kansas City, Missouri  64105

20         For the Defendant Favorite Nurses:
                Mr. Daniel B. Boatright
21              SPENCER, FANE, BRITT & BROWNE, LLP
                9401 Indian Creek Parkway, Suite 700
22              Overland Park, Kansas 66210-2005

23         For the Defendant Missouri Department of
           Corrections:
24              Ms. Sara L. Trower
                MISSOURI ATTORNEY GENERAL'S OFFICE
25              P.O. Box 899
                Jefferson City, Missouri 65102
```

EXHIBIT J

## AAA COURT REPORTING COMPANY

Kansas:   (913) 385-2699          200 Colonial Place          1-800-205-793
Missouri: (816) 471-2766          8001 Conser          www.aaacourtreporters.co
Fax:      (913) 385-2693     Overland Park, Kansas 66204     e-mail: aaarportng@kcnet.co

1        which we talked about already, with Becky Hunt

2        and Susan Nurnberg, we went through those notes

3        and also the other issues of the sign-in

4        sheets, etc.

5    Q.  Does that show something on the 8th, something

6        about calling Alma?

7    A.  Yes.

8    Q.  What occurred on the 8th?

9    A.  It looks like I left a message for her and

10       probably talked to her since I have two check

11       marks there. I don't really recall the

12       conversation, to be honest.

13   Q.  And then it looks like something happened on

14       the 11th, but I wasn't clear what it was or at

15       least I marked the 11th for some reason. Maybe

16       it's just that Susan with nothing else by it.

17   A.  Oh, these are -- Susan is one of my employees

18       in the Cleveland branch, a coordinator. I have

19       several Susans listed in my book.  Should I

20       take that sticky off of there?

21   Q.  Yes. If you don't mind.

22            (Discussion held off the record.)

23   Q.  (By Mr. Meyers) Ms. MacLeod, I think before we

24       changed the tape you were looking for the next

25       entry in your calendar.  Are we up to June 16?

## AAA COURT REPORTING COMPANY

Kansas:   (913) 385-2699          200 Colonial Place          1-800-205-7930
Missouri: (816) 471-2766          8001 Conser          www.aaacourtreporters.com
Fax:      (913) 385-2693      Overland Park, Kansas 66204    e-mail: aaarportng@kcnet.com

1   A.  We are.

2   Q.  Is that the date that Becky gave you her two

3       week notice?

4   A.  Yes.

5   Q.  Do you remember what she told you?

6   A.  It seems to me that she found another job, but

7       I don't recall where.

8   Q.  Something outside of Favorite Nurses?

9   A.  Yes.

10  Q.  Anything else that you discussed with her on

11      June 16 that you can recall?

12  A.  Well, I mean, I remember talking to her that I

13      was real sorry it ended up this way and that we

14      couldn't have worked things out.  I told her

15      that she needed to return her keys and badge.

16      And I think that was the crux of it.  I think

17      she may have said some things that she was very

18      concerned about Susan being there by herself

19      and I told her that we would be looking for a

20      replacement for Becky and hopefully she would

21      have someone soon to help her. She was worried

22      about her working all of the hours by herself.

23  Q.  I notice that in the May 20 conversation Becky

24      and Susan told you that the Department of

25      Corrections had tried to change their hours to

**AAA COURT REPORTING COMPANY**

Kansas:  (913) 385-2699       200 Colonial Place       1-800-205-7930
Missouri: (816) 471-2766         8001 Conser      www.aaacourtreporters.com
Fax:    (913) 385-2693   Overland Park, Kansas 66204   e-mail: aaarportng@kcnet.com

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 3 of 21

1      she's saying there was a memo on the front door

2      that she's attaching.  And then she's saying

3      here's the resignation letter from Susan.  And,

4      third, she's telling you that Susan and Becky

5      did not turn in their ID's and needed to do

6      that.

7   A.  Uh-huh.

8   Q.  What was the issue about this notice posted on

9      the front door?

10  A.  That basically they couldn't come back into the

11      facility unless they were coming to see the

12      superintendent. They were letting all of the

13      staff know that they had left and they were not

14      allowed back in.

15  Q.  What day of the week do you show the 13th is on

16      your calendar?

17            MR. BOATRIGHT:  It's Monday.

18  Q.  (By Mr. Meyers) Is it Monday?

19  A.  Monday, uh-huh.

20  Q.  So had Susan actually resigned on the 10th?

21  A.  I don't know about --

22  Q.  Because it looks like the memo is saying don't

23      let Susan in on the 10th.  And the resignation

24      letter is dated on 10th and indicates it was

25      received on the 10th.

**AAA Court Reporting Company**

Kansas:   (913) 385-2699          200 Colonial Place            1-800-205-7930
Missouri: (816) 471-2766              8001 Conser           www.aaacourtreporters.com
Fax:      (913) 385-2693     Overland Park, Kansas 66204   e-mail: aaarportng@kcnet.com

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 4 of 21

1   A.   I honestly don't know the chronological events.

2        I know that I became aware of it either late

3        Monday or Tuesday. And I'm sure of that fact

4        because I called the coordinator in the Kansas

5        City office and told them to take the shifts

6        out of the computer.  And I do have a note that

7        I called Susan Nurnberg on Friday. And I don't

8        recall having a conversation with her at that

9        point. I know that I did talk to her after she

10       left and requested that she bring her ID badge

11       back in.

12  Q.   Did she do that?

13  A.   I believe she did, yes.

14  Q.   Did she leave it with you or somebody from the

15       facility?

16  A.   At the facility.

17  Q.   Did you have any discussion with Susan after

18       you found out about the resignation beyond just

19       asking her to bring her ID badges back?

20  A.   Yes, we discussed this situation, which she

21       filled me in on that's in the handwritten that

22       she was forced into a car.

23  Q.   Page 90, the last page of Exhibit 41?

24  A.   Yes.

25  Q.   And there she's telling you about an incident

## AAA Court Reporting Company

| Kansas: | (913) 385-2699 | 200 Colonial Place | 1-800-205-7930 |
| Missouri: | (816) 471-2766 | 8001 Conser | www.aaacourtreporters.com |
| Fax: | (913) 385-2693 | Overland Park, Kansas 66204 | e-mail: aaarportng@kcnet.com |

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 5 of 21

1      that occurred shortly before her resignation?

2  A.  Yes.

3  Q.  Did she tell you that this was in part why she

4      resigned?

5  A.  Yes, she felt that she was in an unsafe

6      situation.

7  Q.  Do you remember anything about what she told

8      you about this incident about being forced in

9      the car beyond what is recorded here on page

10      90, the last page of Exhibit 41?

11  A.  No, this pretty much sums up the conversation.

12  Q.  Is there anything other than the return of the

13      ID badges and the incident involving her being

14      forced in the car that you recall discussing

15      with her after learning of her resignation?

16  A.  I asked her if we could be of service to her

17      elsewhere, if she would want to work somewhere

18      else that we had work available.  And she said

19      she was looking for a position and that Kansas

20      City and St. Louis were too far to drive.

21  Q.  I notice in the tape, I think it was on the

22      20th, that you had some discussions about would

23      they go to Columbia and they both indicated yes

24      and you asked about the Lake of the Ozarks and

25      one of them said that that was kind of a

**AAA COURT REPORTING COMPANY**

Kansas:   (913) 385-2699          200 Colonial Place          1-800-205-7930
Missouri: (816) 471-2766          8001 Conser          www.aaacourtreporters.com
Fax:      (913) 385-2693      Overland Park, Kansas 66204    e-mail: aaarportng@kcnet.com

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 6 of 21

1      problem in the summer to get in and out of.

2  A.  Too far, uh-huh.

3  Q.  Did you ever come up with anything in mid

4      Missouri to offer to either Becky or Susan?

5  A.  No. Basically the marketing calls that I did in

6      Jeff City there were no agencies in the area

7      that were using any outside personnel. The two

8      hospitals I marketed -- actually one hospital,

9      Regional, and a doctor's facility, Central

10     Medical, I thought might be possibilities, but

11     they were appalled at our rates and not

12     interested. And we actually marketed Columbia

13     on several occasions, myself and I believe our

14     branch director in St. Louis, and as is the

15     case over the last eight years, Columbia just

16     doesn't use outside agencies. They use

17     occasional travelers, which means a travel

18     company at a much reduced pay rate. So that I

19     didn't have any work for them in that area.

20          (Deposition Exhibit No. 42 was marked

21     for identification.)

22  Q.  (By Mr. Meyers) I'll show you Exhibit 42, which

23     appears to be a memo from Julie to Alma

24     McKinney dated July 8, 1998. Have you ever seen

25     that before?

## AAA COURT REPORTING COMPANY

Kansas:    (913) 385-2699          200 Colonial Place              1-800-205-7930
Missouri:  (816) 471-2766          8001 Conser                    www.aaacourtreporters.com
Fax:       (913) 385-2693          Overland Park, Kansas 66204     e-mail: aaarportng@kcnet.com

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 7 of 21

1   A.   No.

2   Q.   It refers to the fact that Susan was ill on

3        July 8th, correct?

4   A.   Yes.

5   Q.   And it says that Julie apparently found out or

6        made a call that day to inquire about something

7        and learned that -- the correctional officer

8        told her that the front door officer told him

9        that Susan or a nurse had told the front door

10       officer to read the TB skin test. Is that the

11       way you read it?

12  A.   Uh-huh.

13  Q.   Yes?

14  A.   Yes.

15  Q.   Did Julie ever make you aware of that issue?

16  A.   No.

17  Q.   Or Alma?

18  A.   Not that I recall.

19  Q.   So you don't really know anything about what's

20       mentioned here in Exhibit 42 beyond what's in

21       the document it's, correct?

22  A.   Correct.

23            (Deposition Exhibit No. 43 was marked

24       for identification.)

25  Q.   (By Mr. Meyers)  I show you Exhibit 43 to your

## AAA COURT REPORTING COMPANY

Kansas:    (913) 385-2699        200 Colonial Place              1-800-205-7930
Missouri:  (816) 471-2766        8001 Conser            www.aaacourtreporters.com
Fax:       (913) 385-2693     Overland Park, Kansas 66204   e-mail: aaarportng@kcnet.com

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 8 of 21

1       deposition. Is that a May 27, 1998 letter that

2       Mr. Lite wrote to Becky Hunt?

3   A.  Yes, it is.

4   Q.  And basically this is the letter that you

5       discussed with Mr. Hunt, as I recall, at the

6       end of the tape on the May 20 conversation that

7       we should follow up with a letter, basically.

8   A.  I discussed it with David Lite, yes.

9               (Deposition Exhibit No. 44 was marked

10      for identification.)

11  Q.  (By Mr. Meyers) And then is Exhibit 44

12      basically the identical letter with the

13      exception that it's addressed to Susan

14      Nurnberg?

15  A.  It looks like it is identical, yes.

16  Q.  Now, is what you recite about what you were

17      told by the Department of Corrections in the

18      third paragraph -- or what Mr. Lite recites an

19      accurate recitation of what you were told and

20      the assurances you were given when you met with

21      Ms. McKinney and Ms. Ives on May 19?

22  A.  It's pretty much it; I don't recall them saying

23      exactly when the investigation would be

24      complete. I honestly don't recall them saying a

25      time period.  They told us they would let us

## AAA COURT REPORTING COMPANY

Kansas:   (913) 385-2699          200 Colonial Place          1-800-205-7930
Missouri: (816) 471-2766          8001 Conser          www.aaacourtreporters.com
Fax:      (913) 385-2693          Overland Park, Kansas 66204          e-mail: aaarportng@kcnet.com

1     know when it was complete.

2  Q.  Mr. Lite says that he recalled them assuring

3     the two of you that the grievances were being

4     taken seriously.

5  A.  Yes.

6  Q.  Do you recall that?

7  A.  Yes.

8  Q.  And assuring the two of you that no retaliation

9     would be taken?

10 A.  Yes.

11          (Deposition Exhibit No. 45 was marked

12     for identification.)

13 Q.  (By Mr. Meyers) Ms. MacLeod, I'm handing you

14     Exhibit 45 to your deposition, I apologize I

15     don't have any extra copies of it.  But is that

16     the letter that you wrote to Susan Nurnberg on

17     July 17?

18 A.  It's a later David Lite, the human resource

19     manager wrote.

20 Q.  Basically saying what you and I discussed

21     earlier expressing sadness that the situation

22     could not be resolved and asking her to return

23     her identification badge?

24 A.  Yes.  And he referred her to one of our local

25     offices or our travel division and sent her a

## AAA Court Reporting Company

Kansas:    (913) 385-2699          200 Colonial Place          1-800-205-7930
Missouri:  (816) 471-2766          8001 Conser          www.aaacourtreporters.com
Fax:       (913) 385-2693          Overland Park, Kansas 66204          e-mail: aaarportng@kcnet.com

1        list of the offices and telephone numbers.

2                (Deposition Exhibit No. 46 was marked

3        for identification.)

4    Q.  (By Mr. Meyers) And then is Exhibit 46 a

5        similar letter to Becky Hunt asking her to

6        return her identification badge?

7    A.  And her keys, yes.

8    Q.  Before I mark these why don't you kind of walk

9        me through this so I know what I have got here.

10       These are the computer files for Becky and

11       Susan?

12   A.  Yes.  This is actually Susan's computer file

13       for when I sent her file over to the St. Louis

14       branch.

15               MR. BOATRIGHT:  You said Susan.

16   A.  Becky, excuse me. Becky Hunt, yes. And it was

17       entered into the St. Louis computer here.  And

18       it showed the negative availability that I told

19       you that she wouldn't be available until 6/15.

20   Q.  So you interpreted that to mean that she may

21       have given notice to the Department of

22       Corrections that she was no longer going to be

23       there after 6/15?

24   A.  Right. And then these are notes, the last page,

25       that are put into the computer that our

## AAA COURT REPORTING COMPANY

Kansas:   (913) 385-2699        200 Colonial Place        1-800-205-7930
Missouri: (816) 471-2766           8001 Conser          www.aaacourtreporters.com
Fax:      (913) 385-2693     Overland Park, Kansas 66204   e-mail: aaarportng@kcnet.com

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF MISSOURI
 2

 3    REBECCA HUNT and          )
      SUSAN NURNBERG,           )
 4                              )  Case No. 99-4158-CV-C-5
              Plaintiffs,       )
 5                              )
              vs.               )
 6                              )
      STATE OF MISSOURI         )
 7    DEPARTMENT OF CORRECTIONS, )
      and FAVORITE NURSES, INC.,)
 8                              )  March 2, 2000
              Defendants.       )  Jefferson City, Mo.
 9

10              VIDEOTAPED DEPOSITION OF SUSAN NURNBERG,

11    a Plaintiff, produced, sworn and examined on the 2nd day of

12    March, 2000, between the hours of 8:00 a.m. and 6:00 p.m. of

13    that day at the law offices of the Attorney General, in the

14    City of Jefferson, State of Missouri, before

15

16                      TRACY L. THORPE
                     Certified Shorthand Reporter
17              ASSOCIATED COURT REPORTERS, INC.
                     714 West High Street
18              Jefferson City, Missouri  65101
                         (573) 636-7551
19                       (573) 442-3600

20

21    and Notary Public within and for the State of Missouri,

22    commissioned in Boone County, in the above-entitled cause,

23    on the part of the Defendants, pursuant to notice and

24    agreement.

25
```

ORIGINAL
Associated Court Reporters, Inc.
Jefferson City, MO (573) 636-7551

EXHIBIT K

1
ASSOCIATED COURT REPORTERS, INC.
573-636-7551 JEFFERSON CITY, MO
573-442-3600 COLUMBIA, MO

1   It's only been in business probably since the last of

2   January, I would say.

3        Q.    When did you start with them?  The last of

4   January or --

5        A.    No.  I started about two weeks ago actually.

6   I've been in training, so I've only been there actually

7   on-site about three days.

8        Q.    And what are you doing for them?

9        A.    I am the RN that does physical assessments and

10  drug screens, I take care of sick, illness problems, you

11  know, if they have athlete's foot or they get the flu,

12  assess most of their physical medical needs.

13       Q.    When you worked at Jefferson City Manor, who

14  would have been your supervisor or most familiar with your

15  work?

16       A.    Mary Chidwiggen (phonetic spelling) was the

17  director of nursing.

18       Q.    Did her husband work for, like, Highway and

19  Transportation and they moved with their daughter, Joan?

20       A.    Yes.  I think that's -- I think that's right.

21       Q.    They're no longer in this area, are they?

22       A.    I last heard that they had moved to -- I want

23  to say Cape Girardeau, but I can't be positive, but that's

24  been years ago that I heard that.

25       Q.    And Whispering Oaks, who would have been your

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 13 of 21

1    supervisor or familiar with your --

 2          A.      Margie Rost was the director of nursing there

 3    at that time.

 4          Q.      Is she still in this area, do you know?

 5          A.      I have no idea.

 6          Q.      And Whispering Oaks is located where?

 7          A.      Whispering Oaks and -- would be on Edgewood.

 8          Q.      Okay.

 9          A.      Over behind Memorial Hospital.  That empty

10    facility that's always standing back there.

11          Q.      Right.  And the reason you left there is

12    because it closed?

13          A.      Uh-huh.

14          Q.      And when you left Jefferson City Manor, why

15    was that?

16          A.      I think I had -- had a baby.

17          Q.      Okay.  And Riverside Hospital you left because

18    it closed also?

19          A.      Uh-huh.

20          Q.      You have to answer verbally.

21          A.      Yes.

22          Q.      Who would have been your supervisor or person

23    most familiar with your work there?

24          A.      Excuse me.  At what place?

25          Q.      At Riverside.

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 14 of 21

1      A.     I can't think of the man's name, the
2  administrator there, it's been so long ago.  I'm sorry.
3      Q.     When you were a substitute teacher, what --
4  did you just teach whatever they needed?
5      A.     Yes.  Whatever classes they needed.
6      Q.     Lincoln Manor, who was the physician medical
7  director for whom you did this favor?
8      A.     That would most likely, if I can recall, would
9  be Robert Tanner, Dr. Tanner.  He's retired now, I think.
10     Q.     And you said that you were the on-site RN.
11 Does that make you the charge nurse or director of nursing?
12     A.     The charge nurse.
13     Q.     Anybody besides Dr. Tanner who would have been
14 familiar with your work at Lincoln Manor?
15     A.     There is one nurse there that's been there for
16 almost 20 years, Edith Vogel.  I believe she's still there.
17     Q.     Lewis and Clark Middle School, do you know
18 Betty Morris?  Wasn't she a nurse there?  She's, like, the
19 school nurse?
20     A.     Yes.  I think that -- I think that is her last
21 name, Morris.
22     Q.     And I'm assuming since you're assigned to work
23 with essentially two special needs children, you're
24 reporting to the principal or assistant principal?
25     A.     Principal would have been my supervisor.

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 15 of 21

1    Q.    And who's the principal there?

2    A.    Bob Steffes (phonetic spelling), Dr. Steffes.

3  I need to clarify that.

4    Q.    Sure.

5    A.    I was assigned one child.  I took the other

6  child on as a favor.

7    Q.    Okay.  Well, you'd mentioned two different --

8    A.    Yeah.

9    Q.    -- so -- that -- was a year and a half

10  period --

11    A.    Yeah.

12    Q.    -- so I thought maybe you did one one year and

13  one the next.

14    A.    Same time.

15    Q.    And at Preferred Family Health Care you said

16  you just started a couple of weeks ago.  Do you have a title

17  there?

18    A.    I think I'm just called the RN staff.

19    Q.    Okay.  And who's your supervisor there?

20    A.    Mark Stringer is the administrator.

21    Q.    What are you earning at Preferred Family

22  Health Care?

23    A.    I think that he quoted me 30,000 a year.

24    Q.    And are you a full-time employee who's

25  entitled to their benefit package and stuff?

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 16 of 21

1        A.    The benefit package starts, I think, in May as

2  far as insurance is concerned.

3        Q.    And what other benefits are you entitled to?

4        A.    I think he did mention vacation time, but

5  that's about it.  That's about all we discussed.

6        Q.    Retirement plan, anything like that?

7        A.    I don't know about that.

8        Q.    When you were working at Lewis and Clark, what

9  were your earnings?

10       A.    You want what I brought home in my paycheck

11  or -- I think it was 9,000 -- it was 11,500 a year, in that

12  area.

13       Q.    And did you -- were you entitled to benefits?

14       A.    Yes.

15       Q.    Do you know what your benefits were working in

16  the public school system?

17       A.    I had Health Link Insurance and some type of

18  life insurance.

19       Q.    Did you participate in a retirement plan in

20  any way?

21       A.    I don't know if I did or not.  I'm sorry.

22       Q.    That's all right.  Is -- your working at Lewis

23  and Clark, would that have been the employment that

24  immediately followed your leaving employment with Favorite

25  Nurses?

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 17 of 21

1          A.     Yes.

2          Q.     You left your employment with Favorite Nurses,

3     assigned to JCCC, on what date, do you remember?

4          A.     July the 10th, I believe.

5          Q.     And how long a period of time would you have

6     been out of work following your July 10 resignation?

7          A.     I think -- I believe school started

8     August 23rd.

9          Q.     Between July 10 and August 23rd, did you make

10    any attempts to obtain employment?

11         A.     Yes.

12         Q.     What attempts did you make?

13         A.     I put out resumes and made lots of phone

14    calls.

15         Q.     Before finding the position at Lewis and

16    Clark, did you have offered to you any positions between

17    July 10 and August 23rd?

18         A.     No.

19         Q.     Before accepting or after accepting the Lewis

20    and Clark position, did you have any other positions offered

21    to you?

22         A.     No.

23         Q.     Have you ever been involved in any legal

24    proceeding besides this lawsuit?

25         A.     Not that I can ever recall.

1    they were.  And I found that very uncomfortable and unusual.

2         Q.        Why did you find it uncomfortable and unusual?

3         A.        Well, everyone has their -- their preference

4    for space, but they would be right up as close as they could

5    get.

6         Q.        How close is as close as they could get?  Were

7    they touching you?

8         A.        Not touching, but if we would -- if I would

9    have moved, we would have been.

10        Q.        And, again, why did you -- why did that make

11   you uncomfortable?  It violated your personal space?

12        A.        It did more than violate my personal space.

13   It was -- if it had just been them standing there, but it

14   was the leers that I got.

15        Q.        Describe for me the leers, what you mean by

16   "leers."

17        A.        Well, if they would talk to me, instead of

18   looking at me in the face, they would look at my chest.

19        Q.        Anything else besides looking at your chest

20   that you mean when you use the term "leers"?

21        A.        They would look at Becky, look at her behind.

22   It was just a very uncomfortable day.

23        Q.        At any point in that first day did you tell

24   either Mr. Perry or Mr. Seaman that they were making you

25   uncomfortable?

Case 2:99-cv-04158-NKL   Document 51-1   Filed 07/24/00   Page 19 of 21

1    A.    No.

2    Q.    Why not?

3    A.    It was the very first day and I didn't want to

4    start off on a bad foot right off the bat.

5    Q.    At any time on that first day if Mr. Perry and

6    Mr. Seaman were making you uncomfortable, why didn't you go

7    talk to Mr. Dormire about it?

8    A.    Probably because I was pretty stressed about

9    it at that point and I didn't even think about doing that.

10    Q.    You know, most people if somebody's bugging

11    them, you tell them, Hey, bug off or stop it, or whatever.

12    I mean, that's the sensible thing that most people do.  Why

13    didn't you do that?

14            MR. MEYERS:  Object to the form of the

15    question, it's argumentative and it's asked and answered.

16    Go ahead.

17    BY MS. TROWER:

18    Q.    You can answer.

19    A.    Why didn't I tell them?  Probably because I

20    was too polite to say that to them because I wanted to

21    really assess what was going on.

22    Q.    What did you think was going on that first

23    day?

24    A.    I wasn't quite sure at that time.  I was just

25    very uncomfortable and couldn't -- and stressed out.

46
ASSOCIATED COURT REPORTERS, INC.
573-636-7551 JEFFERSON CITY, MO
573-442-3600 COLUMBIA, MO

1    Q.    What happened next in terms of your
2    orientation of the institution?
3    A.    The next day?
4    Q.    If that's the next thing so --
5    A.    When we showed up the next morning, they were
6    waiting at the front step for us.
7    Q.    Anything said at that time?
8    A.    They looked at their watch, I think Mitch did
9    or Rodney, I don't know which, and -- like we had been late
10   or they'd been waiting a long time.
11   Q.    Anything else said or done upon that
12   encounter?
13   A.    They were still, I believe, going to take us
14   through other places, introduce us to other people.  They
15   were going to go up to the office and show us the computer
16   and ask about our schedules that day.
17   Q.    Is that what then happened?
18   A.    I can't say it happened exactly in that time
19   frame, in that morning, but during the day.
20   Q.    When you first meet them on the steps the next
21   morning and they explained to you that they want to continue
22   to show you around and take you to the office and introduce
23   you to the computer and that sort of thing, did you say, No,
24   we don't need that?
25   A.    No.

47
ASSOCIATED COURT REPORTERS, INC.
573-636-7551 JEFFERSON CITY, MO
573-442-3600 COLUMBIA, MO