1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF MISSOURI

2

3    REBECCA HUNT and          )
     SUSAN NURNBERG,           )
                               )  Case No. 99-4158-CV-C-5
4                              )
           Plaintiffs,         )
5                              )
           vs.                 )
6                              )
     STATE OF MISSOURI         )
7    DEPARTMENT OF CORRECTIONS,)
     and FAVORITE NURSES, INC.,)
8                              )  March 1, 2000
           Defendants.        )  Jefferson City, Mo.

9

10         VIDEOTAPED DEPOSITION OF REBECCA HUNT-BROWER,

11   a Plaintiff, produced, sworn and examined on the 1st day of

12   March, 2000, between the hours of 8:00 a.m. and 6:00 p.m. of

13   that day at the law offices of the Attorney General, in the

14   City of Jefferson, State of Missouri, before

15

16                    TRACY L. THORPE
                 Certified Shorthand Reporter
17           ASSOCIATED COURT REPORTERS, INC.
                   714 West High Street
18           Jefferson City, Missouri  65101
                     (573) 636-7551
19                   (573) 442-3600

20

21   and Notary Public within and for the State of Missouri,

22   commissioned in Boone County, in the above-entitled cause,

23   on the part of the Defendants, pursuant to notice and

24   agreement.

                                    ORIGINAL
25                              Associated Court Reporters, Inc.
                                Jefferson City, MO (573) 636-7551
                        1
                 ASSOCIATED COURT REPORTERS, INC.
                 573-636-7551 JEFFERSON CITY, MO
                   573-442-3600 COLUMBIA, MO

EXHIBIT L

1    Q.    Who would have supervised you there, as best
2 as you can recollect?

3    A.    She got married.  I'm trying to remember her
4 name now.  Cathy Rose.

5    Q.    Anybody else at Fulton Manor Care?

6    A.    Chicky Taylor was the administrator.

7    Q.    Chicky?

8    A.    Yes, ma'am.

9    Q.    Anybody else that you can remember there?

10    A.    No.  That would be all.

11    Q.    How about at Fulton Community Care?  When did
12 you work there?

13    A.    I went in per diem during a time that they
14 were -- they had some needs.  I was filling in holes.  The
15 director of nursing had, during that process, walked out.
16 And so I was helping fill day schedules, do scheduling,
17 assist with care plans.

18            And during the time that I was working there,
19 there was an investigation, the Attorney General's Office
20 was involved.  And I ended up leaving because of staffing
21 issues.  There was some patient care concerns.

22    Q.    Who would have supervised you there?

23    A.    They had interim administrators off and on, so
24 I -- I don't even remember names.  And like I explained, the
25 director of nursing had left.

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 2 of 26

1  Q. The Presbyterian Home, where's that located?

2  A. It's in Fulton.

3  Q. And during what period did you work there?

4  A. Oh, my. Probably some in '93, maybe some in

5  '94, '95, approximate time frame.

6  Q. And what did you do there?

7  A. I was an RN. I worked there weekends and per

8  diem again. I filled holes for them.

9  Q. Do you recall any of your supervisors at the

10  Presbyterian Home?

11  A. They changed several times. The administrator

12  was fired during that time, a director of nursing was fired.

13  I don't remember.

14  Q. Missouri Division of Medical Services, is that

15  with the Department of Social Services or --

16  A. Yes, it is.

17  Q. And during what period did you work there

18  doing audits?

19  A. I worked there for the summer just after I

20  left Corrections. I don't remember the year. '97, I think.

21  Q. Who would have been your supervisor there?

22  A. Maggie Buckland.

23  Q. And when you said you were doing audits, what

24  kinds of services were you auditing?

25  A. We audited health care -- health plans.

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 3 of 26

1      Q.     Health plans?

2      A.     Health plans.  For example, Missouri Care,

3 Health Care USA, we did the Medicaid audits --

4      Q.     Okay.

5      A.     -- for the State.

6      Q.     So you're not auditing, like, nursing homes

7 where you're going around and auditing their billings and

8 checking care provided for them?

9      A.     It was the same process, we were just doing it

10 for the health care plans.

11      Q.     Okay.  And why did you leave that employment?

12      A.     There was more travel than what was explained

13 when I started, and I had two small ones still at home and

14 it became -- became difficult to arrange child care.

15      Q.     Were you an employee or an independent

16 contractor for Missouri Division of Medical Services?

17      A.     An employee, I think, because --

18      Q.     Do you recall what your earnings were?

19      A.     I started at approximately 32,000, I think.

20      Q.     And were you receiving the typical State

21 employee benefits?

22      A.     Benefit package, yes, I was.

23      Q.     And how did that salary of $32,000 with a

24 typical benefit package compare to the money that you were

25 making for Favorite Nurses when you were assigned to the

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 4 of 26

1    Department of Corrections?

2          A.      When I was assigned to the Department of

3    Corrections, I was making $26 an hour and I worked 30 hours

4    a week.

5          Q.      How many hours a week did you say?

6          A.      Thirty.

7          Q.      And for Favorite Nurses, did you receive

8    benefits?

9          A.      No.  No benefits.

10         Q.      When did you work for Riverview Nursing Care?

11         A.      I per diemed there probably 1993, '94.  I did

12   very few shifts for them, but it was one of them that was

13   included.

14         Q.      Do you recall who would have been your

15   supervisor there?

16         A.      No, I don't.

17         Q.      Option Care, where is that located?

18         A.      Columbia.

19         Q.      And what do they do?

20         A.      It's a home health agency.

21         Q.      When did you work there?

22         A.      During the time that I worked at the

23   VA Hospital.  And I did per diem while they still had their

24   per diem.  The reason I quit doing shifts for them was

25   because they stopped -- during that time they were having

1   some cutbacks and they weren't using their per diem people.

2          Q.      Who would have been your supervisor at Option

3   Care?

4          A.      It was a huge place.  I don't remember.

5          Q.      When did you work at Pyramid Home Health?

6          A.      I worked at Pyramid after I left the VA

7   Hospital, within the next month or so.  And I worked there

8   until they closed the office, which was just prior to my

9   employment at Jefferson City Correctional Center.

10         Q.      Who would have supervised you there?

11         A.      My direct supervisor at the time was Gordon

12  Butler.

13         Q.      Any other supervisors that you recall?

14         A.      None.  I was the director of nursing in that

15  position.

16         Q.      And you mentioned Tri-County.  What is that?

17         A.      It's an affiliate of the Pyramid company.

18  They just did different services.

19         Q.      Where was it located?

20         A.      I'm not sure where -- the home office, I

21  think, was in Caruthersville.  They had a small office that

22  worked out of the Pyramid office or adjacent to it.

23         Q.      You said Pyramid went out of business.  Is

24  Tri-County out of business also?

25         A.      I don't know.  I don't know.

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 6 of 26

```
 1          Q.      And what period of time did you say you worked
 2   there approximately?
 3          A.      A year, year and a half.  I had done some work
 4   prior, you know, the year before I started doing full --
 5   some, you know, 40-hour weeks.  So during a per-- period of
 6   two years probably off and on.
 7          Q.      Can you recall any of your supervisors there?
 8   Can you recall any of your supervisors there?
 9          A.      With Pyramid?
10          Q.      Tri-County?
11          A.      I don't remember who they used.  I don't
12   remember.
13          Q.      When did you begin working for the Division of
14   Youth Services as a regional nurse?
15          A.      Fall of '98.
16          Q.      And what do your duties entail as a regional
17   nurse?  What's that mean?
18          A.      I started as a facility nurse.
19          Q.      Okay.
20          A.      So since then I've been promoted.  As a
21   facility nurse, I worked within the facility.  I had --
22   there was a new facility being built and it was a 44-bed and
23   I was -- my job was to take care of the youth that were in
24   their care.
25          Q.      Where was that facility located?
```

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 7 of 26

1      A.      It started in Fulton and it moved to
2  Montgomery City.
3      Q.      And how long did you work as a facility nurse
4  before you were promoted to a regional nurse?
5      A.      A little over a year.
6      Q.      And what do you do as a regional nurse?
7  What's the difference?
8      A.      I'm over all of the region.  They have several
9  facilities, not just the one facility.  I oversee -- I
10 oversee -- instead of providing all of the direct care, I
11 have two smaller facilities that I provide direct care and
12 the rest I oversee.
13     Q.      Okay.  And where are those other facilities or
14 what are the facilities within your region that you're
15 responsible for?
16     A.      I'm fa-- I'm responsible for the northeast
17 region, which would include facilities in Columbia -- two
18 facilities in Columbia, one in Mexico, one in Fulton, one in
19 Troy and one in Montgomery City, with another one being
20 built in -- or started this year in Fulton.
21     Q.      Do you then supervise all the persons that are
22 employed in those facilities?
23     A.      I don't directly supervise them.  The managers
24 are their site supervisors.  I oversee -- I do the audits, I
25 oversee the health care, but I don't have direct supervision

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 8 of 26

1    for the nurses.  I'm involved with hiring and recruiting.

2          Q.      And are those facilities facilities that are

3    owned and operated by the State or facilities that are owned

4    and operated by some other entities that contract with the

5    State to provide services?

6          A.      These are all State facilities.

7          Q.      Who are your supervisors at Division of Youth

8    Services?

9          A.      My supervisor now is Terry Finn.  He's the

10   regional administrator.

11         Q.      F-i-n-n?

12         A.      Yes.

13         Q.      Does he work here in Jeff City?

14         A.      He -- his -- our regional office is in

15   Columbia.

16         Q.      Do you know who his boss is?

17         A.      Mark Stewart is the director.  I assume that's

18   his supervisor.  I assume.

19         Q.      And when you started as a facility nurse, what

20   was your salary?

21         A.      Approximately 30,000.

22         Q.      And were you a State employee?

23         A.      Yes, I was.

24         Q.      So you got the typical State employee

25   benefits?

ASSOCIATED COURT REPORTERS, INC.
573-636-7551 JEFFERSON CITY, MO
573-442-3600 COLUMBIA, MO

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 9 of 26

1    A.    State package, yes.

2    Q.    And when you were promoted to regional

3 supervisor, what -- or regional nurse, excuse me, what's

4 your salary?

5    A.    My starting salary was approximately 32,000.

6    Q.    Has it increased?

7    A.    No.  I've just been with the job two months.

8    Q.    How did you come to be hired by the Division

9 of Youth Services?

10    A.    I was on State registers and you receive the

11 notices when the openings come available.

12    Q.    How long have you been on registers with the

13 Office of Administration for State vacancies?

14    A.    Off and on for a couple -- two to three years

15 probably.

16    Q.    Besides nursing positions, have you been on

17 any registers other than those that deal with nursing?

18    A.    Just nursing.

19    Q.    What's your current home address?

20    A.    My current address is 7680 County Road 407,

21 Fulton, Missouri.

22    Q.    65251?

23    A.    Yes.

24    Q.    How long have you lived at that address?

25    A.    We bought the house last summer, June, July.

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 10 of 26

1   not common practice for them to post notices regarding

2   persons who are to be denied access to the institution?

3          A.     The only time that I saw something like this

4   put up and posted was with a CMS employee that had quit and

5   was making physical threats with a gun about other employees

6   in the building.  So it would have been a risk, a safety

7   risk.  That is the only time during the amount of time that

8   I spent there that I saw anything like this posted.  And

9   there were several employees that -- you know, I wasn't the

10  only employee that quit during that time.

11         Q.     Who was the CMS employee that you note quit

12  and there was a posting for them?

13         A.     I don't remember.

14         Q.     Male, female?

15         A.     It was a male nurse is -- is all I know.

16         Q.     Is there anything about your name and your

17  numbers appearing overlaid your -- overlaid on your picture

18  that bothers you or offends you?

19         A.     Yes.  This --

20         Q.     Why?

21         A.     What offends me about this is, number one,

22  it's posted.  The part about the name and the number across

23  my chest reminds me of an inmate.

24         Q.     When you gave your two week's notice to

25  terminate your employment with Favorite Nurses and leave

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 11 of 26

1  JCCC, did you already have other employment lined up?

2       A.    I'm trying to remember.  I probably did.  I

3  did, because I left -- when I left, I went to a new job

4  afterwards.

5       Q.    What was the new job you went to immediately

6  after leaving JCCC?

7       A.    Division of Medical Services.

8       Q.    Did you lose -- was there any period of

9  unemployment between the date that you quit working at JCCC

10  for Favorite Nurses and when you began working at Division

11  of Medical Services doing auditing?

12       A.    If it was, it was a couple of days between the

13  ending of one job and the starting of another.

14       Q.    When, in the course of your employment with

15  Favorite Nurses while you were working at JCCC, did you

16  first decide that you were going to look for other

17  employment and leave?  I'm assuming you made that decision

18  before you gave your two week's notice, so --

19       A.    Yes, I did.  If I recall right, probably late

20  May.

21       Q.    Is there anything that would help refresh your

22  recollection as to the exact date of when you may have come

23  to that decision?

24       A.    I don't remember.  It was late May is probably

25  the best I could do.

ASSOCIATED COURT REPORTERS, INC.
573-636-7551 JEFFERSON CITY, MO
573-442-3600 COLUMBIA, MO

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 12 of 26

1    Q.    With respect to your employment at the
2 Division of Medical Services, did you have to fill out an
3 application or anything like that that would show when you
4 might have started pursuing that position?
5    A.    I was -- I'd been on registers for -- for --
6 you know, prior to starting, you know, work with
7 Corrections, so I was on registers.  So you occasionally got
8 fliers depending on how many they sent out for that
9 position, but you received things in the mail.  And that's
10 how I found out about the position at DMS.
11    Q.    Okay.  Even though -- it's my understanding
12 even though when they send those things out, that sometimes
13 you still have to go fill out an application for the
14 particular agency that you're working for --
15    A.    Not necessarily.
16    Q.    -- or some documentation?
17    A.    Not with nursing.
18    Q.    That's not your recollection in this position?
19    A.    Not that I can remember, because you fill out
20 one when you get hire-- or when you get on the register.
21    Q.    Did you have to interview with anybody at the
22 Division of Medical Services before you were offered that
23 job, or did it just come by virtue of your expressing your
24 interest in response to one of these fliers that you
25 received?

ASSOCIATED COURT REPORTERS, INC.
573-636-7551 JEFFERSON CITY, MO
573-442-3600 COLUMBIA, MO

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 13 of 26

1  Printmaster, things that we could, you know, print forms on,

2  brochures, things like that. But that would -- that's all,

3  you know. If there were things on it prior to when we came,

4  I didn't know what they were.

5          Q.      In terms of the computer that you were

6  provided access to and use of in the nursing office, were

7  you familiar with that program and how -- you know, that

8  equipment, or did you need any training on that equipment?

9          A.      I've worked on computers before. I did

10  newsletters at previous places, you know, where I've worked

11  and I knew -- I wasn't a computer wiz, but I knew the basics

12  about how to, you know, work the printer, operate the

13  monitor, the keyboard. I knew how to do that.

14          Q.      So you never had occasion to ask Mr. Seaman to

15  help you with your computer equipment?

16          A.      There might have been a time early on when we

17  first got there that we might have asked his assistance, you

18  know, a question, How do you load -- how do you, you know --

19  you know, load this program? I mean, there might have been.

20  I can't recall, but there -- there possibly could have been

21  a time.

22          Q.      And you said Mr. Perry was in your area less

23.  after you made that complaint to Ms. Ives within the first

24  week. When you say "less," how frequently do you recall his

25  being in your area between that complaint to Ms. Ives and

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 14 of 26

1  the middle of April when you formalized your complaint to

2  the investigator?

3         A.     As time went on, like I explained, it was less

4  and less. It -- from what started as constantly at our

5  side, went to, you know, passing in the hall two -- two --

6  maybe two to three times a week perhaps. But when he was in

7  there, he wasn't at our side constantly while we were --

8  during our work shift, during our shift.

9         Q.     After you complained to Ms. Ives about

10 Mr. Perry and before you filed your complaint with the

11 investigator in the middle of April, did Mr. Perry engage in

12 any kind of harassing conduct directed toward you?

13         A.     Toward me?

14         Q.     Yes.

15         A.     Other than glares, not speaking, you know,

16 when -- you know, when you pass in the hall, that type of

17 thing, no.

18         Q.     When you say "glares," are those the kind of

19 glares that occurred in those first two days where he's

20 glaring at your chest, or is this the glare that would

21 indicate to you he's not happy with you or doesn't like you?

22 Is there a distinction when you use the word "glare" there?

23         A.     There's a distinction. When I -- when I talk

24 about the men looking at our chest as I'm watching -- as

25 I'm -- as I'm looking at this, you know, no eye contact and

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 15 of 26

1  when a man -- any little bit of a look that you did get

2  prior to, you know, the harassment -- letting her know about

3  the harassment in the beginning, the kind of look was as --

4  is -- it's as though the -- both men, not just one man, but

5  both men were undressing you with their eyes.  That's that

6  kind of look.  The glare that I described later is dislike,

7  disdain glare and -- you know, glare.  There was a

8  difference.

9       Q.    Okay.  And in those contacts with Mr. Perry

10 after you complained to Julie Ives about him, did he ever do

11 anything which you found to be offensive in a sexually

12 suggestive nature?

13      A.    With Rodney Perry?

14      Q.    Yes.

15      A.    To me?

16      Q.    Yes.

17      A.    No.

18      Q.    Okay.  And after you complained to Julie Ives

19 about Rodney Perry, did you observe any incidences where

20 Mr. Perry did anything that you thought was sexually

21 offensive to Susan Nurnberg?

22      A.    Can we go back?

23      Q.    Sure.

24      A.    Can I go back to that?  I either misunderstood

25 or I wanted to -- what was the -- could you tell me the

ASSOCIATED COURT REPORTERS, INC.
573-636-7551 JEFFERSON CITY, MO
573-442-3600 COLUMBIA, MO

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 16 of 26

```
 1   question again?
 2            Q.      Yeah.
 3            A.      Okay.
 4            Q.      After you complained to Julie Ives about
 5   Rodney Perry --
 6            A.      Uh-huh.
 7            Q.      -- did you ever observe Mr. Perry do anything
 8   that you thought was sexually offensive to Susan Nurnberg?
 9   The prior question I'd asked you in relation to yourself.
10            A.      Okay.
11            Q.      Now I'm asking, did you observe anything that
12   he did to Susan Nurnberg?
13            A.      Okay.  And what I was trying to get back to
14   was during what time frame?
15            Q.      After you first complained to Julie Ives.
16            A.      There was a period when we were holding a
17   blood sugar clinic when Rodney -- Rodney Perry and Janice
18   Schnazmeyer were in the visitation room where we were
19   holding the clinic.  They were holding hands at times.  His
20   hand were -- was on her buttocks, hers was on his, giggling,
21   holding hands, that type of thing.  And I found that
22   offensive.
23            Q.      Okay.
24            A.      Okay.
25            Q.      Is that the only instance of Mr. Perry's --
```

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 17 of 26

1    A.    For me.

2    Q.    -- conduct?

3          What about with respect to Mr. Con--

4    Mr. Perry's conduct and it's being directed at Ms. Nurnberg?

5    Did you ever observe instances where you saw him engage in

6    offensive conduct directed at Ms. Nurnberg after you

7    complained to Julie Ives?

8    A.    After we complained to Julie.  Other than at

9    times there were telephone conversations where I was in the

10   room where, you know, it sounded like it wasn't a cordial

11   conversation.  Other than that, no.

12   Q.    When you observed Mr. Perry and

13   Ms. Schnazmeyer at the -- did you say it was blood sugar --

14   A.    It was a blood sc-- blood sugar screening

15   clinic.

16   Q.    Blood sugar screening clinic, and you were

17   offended by their carrying on between one another, did you

18   tell either Mr. Perry or Ms. Schnazmeyer that their conduct

19   offended you?

20   A.    No.  I just looked shocked.  I couldn't

21   believe I had grown adults standing in front of me in a very

22   open, not private area.  It was in a very large, open room

23   doing this and the room had cameras in it, that type of

24   thing.  I was just surprised that they would -- that anyone

25   would be as bold as to do that.

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 18 of 26



```
 1           IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                    CENTRAL DIVISION

 3
     REBECCA HUNT, et al.,          )
 4                                  )
                  Plaintiffs,       )
 5                                  )
             vs.                    )  Case No. 99-4158-CV-C-5
 6                                  )
     STATE OF MISSOURI, DEPARTMENT  )
 7   OF CORRECTIONS, et al.,        )
                                    )  February 3-4, 2000
 8                Defendants.       )  Jefferson City, Mo.

 9                          oOo

10             DEPOSITION OF JULIE IVES,

11   a witness, produced, sworn and examined on the 3rd and

12   4th days of February, 2000, between the hours of

13   8:00 a.m. and 6:00 p.m. of that day at the offices of

14   the Attorney General, Broadway State Office Building,

15   7th Floor, in the City of Jefferson, County of Cole,

16   State of Missouri, before

17

18           KELLENE FEDDERSEN, CSR, RPR
             ASSOCIATED COURT REPORTERS, INC.
19                714 West High Street
                   P. O. Box 1308
20          Jefferson City, Missouri 65109
                   (573) 636-7551
21

22   and Notary Public within and for the State of

23   Missouri, commissioned in Cole County, in the

24   above-entitled cause, on the part of the Plaintiffs,

25   pursuant to Notice.
```

1

COPY
Associated Court Reporters, Inc.
Jefferson City, MO (573) 636-7551

**EXHIBIT M**

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 19 of 26

1   more than one facility?  What was their physical

2   responsibility?

3        A.    They were assigned to Jefferson City

4   Correctional Center.

5        Q.    And that's the place where they reported to

6   work every day that they were supposed to report to

7   work?

8        A.    Yes.

9        Q.    Okay.  Now, who are Rodney Perry and Mitch

10  Seaman?

11       A.    They're fire and safety specialists at the

12  Jefferson City Correctional Center.

13       Q.    Still there in that capacity?

14       A.    Yes.

15       Q.    And were both of them there in that capacity

16  when Susan Nurnberg and Becky Hunt started in December

17  of '97?

18       A.    Yes.

19       Q.    What is the job duty interface between the

20  positions then occupied by Mr. Perry and Mr. Seaman

21  and the employee health nurse positions into which

22  Ms. Hunt and Ms. Nurnberg were hired?

23       A.    Okay.  The fire and safety specialists had

24  been there for a long period of time, and part of what

25  we had hoped to accomplish with the employee health

16

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 20 of 26

1 nurse program was that we would reduce our workers'
2 compensation costs. And the fire and safety guys are
3 the ones that look at the accidents and incidents and
4 have monthly meetings to determine what happened and
5 how do we prevent this from reoccurring.
6      So the hope was that they would work
7 together to look at what kind of incidents were
8 occurring and how the fire and safety guys would
9 impact it from the safety side and how the employee
10 health nurses could impact it from the health side
11 from the standpoint of health education, if it was an
12 educational issue on how you better take care of
13 yourself, or actually seeing the people post-accident
14 prior to going out, because a lot of times if it was
15 just a scratch or a nonrisky blood exposure, instead
16 of sending somebody to the ER for a couple hundred
17 dollars, you could see the employee health nurse at
18 the work site.
19      She could put a band-aid on it, do
20 counseling that this really isn't risky, and you'd
21 save a couple hundred instead of sending somebody to
22 an ER.
23      Q.    So there would be some meetings and some
24 analyses of accidents and incidents is essentially one
25 area where there would be overlap?

ASSOCIATED COURT REPORTERS, INC.
(573)636-7551 JEFFERSON CITY, MO 65109
TOLL FREE - 1-888-636-7551

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 21 of 26

Page 1 of 41 Pages

```
 1          IN THE UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF MISSOURI
 2                   CENTRAL DIVISION

 3   REBECCA HUNT, et al.,        )
                                  )
 4            Plaintiffs,         ) Case No. 99-4158-CV-C-5
                                  )
 5        vs.                     )
                                  )
 6   STATE OF MISSOURI, DEPARTMENT)
     OF CORRECTIONS, et al.,      )
 7                                )
              Defendants.         ) March 8, 2000
 8                                ) Jefferson City, MO

 9
              DEPOSITION OF DONALD V. CLINE,
10
     a witness, sworn and examined on the 8th day of March,
11
     2000, between the hours of 8:00 a.m. and 6:00 p.m. of
12
     that day at the law offices of the Missouri Attorney
13
     General, Broadway State Office Building, Seventh
14
     Floor, in the City of Jefferson, County of Cole, State
15
     of Missouri, before
16
             PATRICIA A. DURBIN, RPR, CSR, CCR
17                 Registered Merit Reporter
             ASSOCIATED COURT REPORTERS, INC.
18                  714 West High Street
                       P.O. BOX 1308
19                JEFFERSON CITY, MO  65102
                      (573) 636-7551
20
21   within and for the State of Missouri, in the
22   above-entitled cause, on the part of the Plaintiffs,
23   taken pursuant to agreement.
24
25
```

                        1
             ASSOCIATED COURT REPORTERS, INC.
             573-636-7551 - Jefferson City, MO
             573-442-3600 - Columbia, Missouri

Page 2 of 41 Pages

```
 1              A P P E A R A N C E S
 2

 3   FOR THE PLAINTIFFS:

 4     MARTIN M. MEYERS
              Attorney at Law
 5       THE MEYERS LAW FIRM
         1100 Main Street
 6       Suite 2850
         Kansas City, Missouri  64105-2112
 7       (816) 421-4040

 8   FOR THE DEFENDANTS:

 9     SARA TROWER
              Assistant Attorney General
10       MISSOURI ATTORNEY GENERAL'S OFFICE
         P. O. Box 899
11       Jefferson City, Missouri  65102
         (573) 751-3321
```

```
12

13   SIGNATURE INSTRUCTIONS:

14       Presentment waived; obtain signature.

15

16   EXHIBIT INSTRUCTIONS:

17       None marked.

18                I N D E X

19   Direct Examination by Mr. Meyers        3
     Cross-Examination by Ms. Trower        37
20   Redirect Examination by Mr. Meyers     38

21
22
23
24
25
```

                        2
             ASSOCIATED COURT REPORTERS, INC.
             573-636-7551 - Jefferson City, MO
             573-442-3600 - Columbia, Missouri
                      **NOTES**

**EXHIBIT N**

Case 2:99-cv-04158-NKL   Document 51-2   Filed 07/24/00   Page 22 of 26

1   Q.   So you didn't really expect to receive an
2  explanation --
3   A.   No.
4   Q.   -- correct?
5   A.   Blind and hesitating obedience to the man in
6  command.
7   Q.   Okay.
8   Tell me about your job responsibilities back
9  in December of '97, the first half of '98 insofar as
10 physically how often you would be at your desk there
11 in the JCCC.
12   A.   Oh, I'm there probably more than I'd like to
13 be.  But I was -- I would probably say three or four
14 or five hours a day when I'm not going through the
15 institution.
16   Q.   Right.
17   A.   Or some other training or something else
18 assigned to.
19   Q.   It sounds like you're estimating about half
20 of the time is spent at your desk --
21   A.   Half of the time.
22   Q.   -- and half of the time what they would say
23 in the field?
24   A.   Uh-huh.
25   Q.   Yes?

1   A.   Yes.  I would say that.
2   Q.   All right.  And is there any regular
3  schedule as to when you're usually at your desk and
4  when you're usually in the field?
5   A.   Not really.  It varies in terms of demand.
6   Q.   What about Mr. Dormire back in that time
7  frame?
8   A.   Probably his is about the same.  Probably he
9  would be at his desk probably more than I would.  But
10 I have to do audits and things of that nature.
11   Q.   Now, what about the secretaries to the two
12 of you back then?  Were they pretty much at their desk
13 throughout the day?
14   A.   When they're not out smoking.
15   Q.   You were nodding yes before you said when
16 they're not out smoking.  Correct?
17   A.   Yes.
18   Q.   Theoretically they're at their desk
19 throughout the day --
20   A.   Right.
21   Q.   -- when they're not on break?
22   A.   Right.
23   Q.   At any point did you become aware of any
24 complaints that the nurses had about how their time
25 sheets were getting processed from the time you became

1  responsible for them?
2   A.   Not any specific complaints that I recall.
3  I didn't know anything about their difficulties until
4  they came to the point when they felt they had to
5  leave.
6   Q.   The point when you felt they had to leave or
7  they felt?
8   A.   No.  When they felt they had to leave.
9   Q.   Was it after they left that you learned
10 about that?
11   A.   It was at that time when they --
12   Q.   And --
13   A.   -- when apparently the communication was
14 that they couldn't tolerate it any longer.
15   Q.   All right.  And what one of the things you
16 were told at that time is that they were having
17 difficulty getting their time sheets signed from the
18 time you took over that responsibility.  Is that what
19 you were told?
20   A.   Well, again, I was not told about the time
21 sheets.  I -- other than that I was to take that over
22 at that time.  There are some other things that, you
23 know, if you'll ask the questions, why, I could relate
24 to.  But the two people that work for me, the fire and
25 safety people, which apparently the grievance

1  indicates that the case is about, there was kind of a
2  superimposed -- Julie Ives and then the nurses and the
3  fire and safety, they had their own agenda.
4   I didn't have any direct line of
5  communications on that.  Sometimes Central Office
6  people from there come over and, you know, they may
7  have -- they coordinate or whatever, services.
8   Q.   Well, did Julie Ives have some
9  responsibility for these fire and safety employees as
10 you understood it?
11   A.   As far as on the -- as far as the structure
12 of job description and that sort of thing, I don't
13 believe you would find it, because of some of the
14 natures of the complaints of people who are hurt on
15 the job and that sort of thing, fire and safety looked
16 into those.
17   I for a purpose of performance appraisals
18 and that sort of thing have that responsibility.
19 But at that point in time there was kind of an
20 unofficial -- Mrs. Ives didn't come through me on it.
21 She may have come through the superintendent but she
22 didn't come through me.
23   My job with the nurses were to check the
24 time sheets.
25   Q.   Okay.  From and after the time Mr. Dormire

**NOTES**

**NOTES**

1        IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF MISSOURI
2             CENTRAL DIVISION
3

REBECCA HUNT, et al.,       )
4                        )
            Plaintiffs,     )
5                        )
        vs.           ) Case No. 99-4158-CV-C-5
6                        )
STATE OF MISSOURI, DEPARTMENT )
7 OF CORRECTIONS, et al.,   )
                        ) February 4, 2000
8         Defendants.   ) Jefferson City, Mo.
9                    oOo
10

        DEPOSITION OF MITCHELL SEAMAN,
11
a witness, produced, sworn and examined on the 4th day
12
of February, 2000, between the hours of 8:00 a.m. and
13
     p.m. of that day at the offices of the Attorney
14
General, Broadway State Office Building, 7th Floor, in
15
the City of Jefferson, County of Cole, State of
16
Missouri, before
17
18        KELLENE FEDDERSEN, CSR, RPR
        ASSOCIATED COURT REPORTERS, INC.
19        714 West High Street
          P. O. Box 1308
20     Jefferson City, Missouri 65109
          (573) 636-7551
21
22 and Notary Public within and for the State of
23 Missouri, commissioned in Cole County, in the
24 above-entitled cause, on the part of the Plaintiffs,
25 pursuant to Notice.

**EXHIBIT O**

1  answering yes to?
2      THE WITNESS:  That there was personal
3  discussion made in their office.
4      MS. TROWER:  You talked to them about your
5  personal stuff?
6      THE WITNESS:  No.  They talked to me
7  about --
8      MS. TROWER:  What did you mean when you
9  answered vice versa?
10     THE WITNESS:  That they were the ones that
11 discussed their personal life.
12     MR. MEYERS:  That's the way I understood it.
13     MS. TROWER:  I just want to make sure it's
14 clear on the record.  It wasn't clear.
15 BY MR. MEYERS:
16     Q.   Tell me about the discussion you're
17 referring to.
18     A.   It's just that every time that we would go
19 up there they would be having some kind of problem
20 with their personal life.  I know Ms. Hunt was going
21 through a divorce.  Now, Ms. Hunt usually didn't talk,
22 but Ms. Nurnberg told me that Ms. Hunt was going
23 through a divorce, her husband wouldn't do anything
24 for her, she had to mow the grass, she had to do the
25 laundry, just general discussion.

1      Q.   And this occurred on a number of occasions
2  or is it just a single conversation you're recalling?
3      A.   Numerous times.
4      Q.   Each time with Ms. Nurnberg telling you
5  something of a personal nature about Ms. Hunt?
6      A.   Or about herself.
7      Q.   Did Ms. Hunt ever share personal things
8  about herself or about Ms. Nurnberg with you?
9      A.   Yes, sir.
10     Q.   What?
11     A.   I don't know.  Just personal every day talk,
12 you know, a problem that she might have.
13     Q.   But you can't remember anything specific
14 today?
15     A.   No.
16     Q.   What personal things did Ms. Nurnberg tell
17 you about her own life?
18     A.   I can't remember per se, sir.  It's been
19 quite a long time ago.
20     Q.   I'm trying to get a handle on the extent to
21 which either of these ladies revealed personal things
22 to you about their own life, and I want to give you a
23 couple of examples, gives you an idea of what I'm
24 talking about.
25         Sometimes people say, I'm having a bad day

1  because I was -- my inlaws kept me up late last night
2  or something.  There's a point having to do with their
3  current situation where they share something that
4  might technically be personal but it's not really some
5  long, in-depth personal discussion.
6          Is it that kind of conversation you're
7  talking about?
8      MS. TROWER:  I'm going to object to the
9  form.  I think it's been asked and answered.  You
10 asked him what they said and he's told you the best he
11 can recall.
12     You can answer.
13     THE WITNESS:  Yes, sir, that's what I'm
14 trying to say.
15 BY MR. MEYERS:
16     Q.   As opposed to sitting down and having a
17 longer conversation or sharing really personal
18 intimate details?
19     MS. TROWER:  Object as to form.  You can
20 answer.
21     THE WITNESS:  Yes, sir.
22 BY MR. MEYERS:
23     Q.   You never had that kind of discussion with
24 either of them?
25     A.   No, sir.  To go back to your question about

1  Mrs. Nurnberg, I remember one particular day that she
2  made the statement that, it seemed like, and I want to
3  get it right, in words to the effect that there's so
4  many men chasing them that they just didn't know what
5  they were going to do, that they had so much work to
6  do that they just didn't have time for it, words to
7  that effect.  I can't per se say that's -- and that's
8  the kind of conversation I'm talking about, not
9  lengthy discussions.
10     Q.   I'm trying to figure out what you
11 understood.  You understood her to be saying that
12 there were men trying to have some kind of a social
13 relationship with them, but they were too busy with
14 their work; is that what you understood?
15     MS. TROWER:  Objection as to form.
16     THE WITNESS:  I don't know what she meant by
17 it, to tell you the truth.  I just kind of ignored it.
18 BY MR. MEYERS:
19     Q.   When she said there were men after her, she
20 had a lot of work to do --
21     MS. TROWER:  Objection as to form.
22     THE WITNESS:  Like I said, I don't really
23 understand what she meant by it.  I just remember her
24 saying that, and it was one of the hectic days or that
25 she claimed was a hectic day.

BY MR. MEYERS:
1   BY MR. MEYERS:
2       Q.   So she might have been referring to men in
3   the prison who were making demands on her time
4   job-wise?
5       MS. TROWER:  Objection.
6       MR. MEYERS:  Is that what you're saying?
7       MS. TROWER:  Objection as to form.  Assumes
8   facts not in evidence.  It's argumentative.  It's been
9   asked and answered.
10      THE WITNESS:  Like I said, I don't know what
11  she meant.
12  BY MR. MEYERS:
13      Q.   And you didn't have an impression one way or
14  the other as between those two or some other meaning,
15  right?
16      MS. TROWER:  Objection.  It's been asked and
17  answered.
18  BY MR. MEYERS:
19      Q.   Right?
20      A.   No, sir.
21      Q.   No, sir, it's not right or yes, sir?
22      A.   I didn't have an opinion on what she meant.
23      Q.   Now, did you ever ask personal questions of
24  either of the nurses either about themselves or the
25  other?

1   Hunt about anything to do with her and a bathing suit
2   or a swimming suit?
3       A.   No, sir.
4       Q.   Did you ever have any conversation with
5   Becky Hunt or Susan Nurnberg where you made any
6   reference to either one of their behinds, fannies,
7   butts, using any other word that means the same thing?
8       A.   No, sir.
9       Q.   Did you ever have any conversation with
10  either of the nurses where you or the nurse got upset
11  with the other and raised your voice or they raised
12  their voice?
13      A.   Yes, sir.
14      Q.   Are we talking about one occasion or more
15  than one?
16      A.   I can only remember one occasion, sir.
17      Q.   Who were you having a discussion with?
18      A.   Susan Nurnberg.
19      Q.   About what?
20      A.   About an investigation that she did of an
21  accident.
22      Q.   What had you learned that gave rise to that
23  call or conversation?
24      A.   That there was an investigation done about
25  an incident that happened in a tower, and that

1       A.   No, sir.
2       Q.   Does your wife work at the facility?
3       A.   Yes, sir.
4       Q.   Where does she work?
5       A.   She works in the records office.
6       Q.   Where is that located?
7       A.   Right across the -- it's on the second floor
8   of the administration building.
9       Q.   And where is that in relation to the health
10  office?
11      A.   Right across the hall.  The employee health
12  nurse is up the stairs and down the hall, and the
13  records office is up the stairs and just to the right.
14      Q.   So is it a situation where if you're
15  standing in the door of the nurses' office and looking
16  out, are you looking into the records office?
17      A.   No, sir.
18      Q.   It's down the hallway one way or the other?
19      A.   Yes, sir.
20      Q.   Did either of the nurses ever say anything
21  to you or behave in a way that led you to believe they
22  felt uncomfortable with your intruding on their
23  physical space?
24      A.   No, sir.
25      Q.   Did you ever have any discussion with Becky

1   Ms. Nurnberg went out there to investigate it.  I
2   telephoned the nurses' office from my office and asked
3   her why weren't we informed of the investigation, and
4   she told me that she didn't know why we weren't
5   informed.
6       And I stated, Well, professional common
7   courtesy would have been to call us.  Ms. Nurnberg
8   raised her voice and told me she was ordered to do
9   this.  I asked her who ordered her.  She stated
10  Mr. Oetting.  I asked her, why would Mr. Oetting ask
11  her when that is our job.  She continued to raise her
12  voice, and then she hung the phone up on me.
13      Q.   Did you raise your voice with her?
14      A.   No, sir.
15      Q.   Did you ever ask Mr. Oetting whether he did
16  instruct her to do that?
17      A.   No, sir.
18      Q.   To this day, have you ever asked Mr. Oetting
19  that?
20      A.   No, sir.
21      Q.   Do you know one way or the other, other than
22  what Ms. Nurnberg told you, whether Mr. Oetting gave
23  her those instructions?
24      A.   I do not know.  I've never asked.  I think
25  it was brought up in discussion at a -- over a general

11 (Pages 38 to 41)

ASSOCIATED COURT REPORTERS INC
1-888-636-7551