IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| REBECCA HUNT, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 99-4158-CV-C-5 |
| ) | |
| STATE OF MISSOURI, ) | |
| DEPARTMENT OF ) | |
| CORRECTIONS, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ORDER AND MEMORANDUM**

Pending before the Court is a Motion for Summary Judgment filed by the State of Missouri, Department of Corrections' (the "Department") [Doc. #42]. For the reasons set forth below, the Motion is granted, in part, and denied, in part.

**I.   Factual Background**

   **A.   Contract Between the Department and Favorite Nurses**

Leopoldstadt, Inc., d/b/a Favorite Nurses, Inc. ("Favorite Nurses")[1] is a private company that assigns contract nurses to various worksites throughout the country. In October 1997, the Department and Favorite Nurses signed a contract whereby Favorite Nurses would provide "employee health nurses" to various Missouri prisons. Under the contract, the nurses were to conduct nursing assessments, diagnose and provide care

---

[1] Favorite Nurses was originally a co-defendant in this suit, but was later voluntarily dismissed as a party by the Plaintiffs.

plans, coordinate an employee health program, conduct TB testing and other specified nursing activities at the Jefferson City Correctional Center ("JCCC").

The contract states:

> the contractor represents himself or herself to be an independent contractor offering such services to the general public and shall not represent himself/herself or his/her employees to be an employee of the State of Missouri. Therefore, the contractor shall assume all legal and financial responsibility for taxes, FICA, employee fringe benefits, workers compensation, employee insurance, minimum wage requirements, etc . . . .

The nurses' pay, employee benefits, vacation, and income withholding were all handled by Favorite Nurses. The nurses were, however, required to have JCCC employees sign off on their timecards. Favorite Nurses also had its own separate sexual harassment policy and grievance procedure.

According to the contract, the nurses were to work "independently with a minimum of supervision" by Department employees. The Department contends that nurses were not subject to regular performance evaluations by it, but rather, Favorite Nurses was responsible for such reviews. The Department was, however, permitted to review the nurses to insure "conformance with established nursing policies." It is not clear how such a review would differ from a performance evaluation. The nurses were additionally required to undergo background and security checks prior to beginning work in a Department of Corrections' facility.

### B. Plaintiffs' Employment at JCCC

Pursuant to the contract terms, specific preidentified nurses were to be provided to the Defendants by Favorite Nurses. Substitutions of personnel could not be made by Favorite Nurses without prior notice and approval by the Department. The Plaintiffs, Rebecca Hunt and Susan Nurnberg, were initially contacted, interviewed and told they had a job by Department employee Julie Ives, RN-V. Hunt alleges that Ives informed her that if the "program" was successful, the Plaintiffs' positions would become full-time Department positions at the end of the year. According to Plaintiffs, the Department contacted Hunt before contracting with Favorite Nurses. Hunt had previously been providing nursing services to the Department while she worked as a public health nurse for Cole County, Missouri. When Cole County stopped providing nursing services to the Department, the Department sought out Favorite Nurses and identified Hunt as the person they wanted to work at JCCC. Nurnberg was allegedly identified by Hunt as a person who should be interviewed as well.

The Department acknowledges that Ives was responsible for providing Plaintiffs information about "nursing protocols" and other nursing related questions. David Dormire, Superintendent of JCCC, acted as the Plaintiffs' on-site contact person. The record is unclear how much direction was given to the Plaintiffs by the Defendants.

When Plaintiff began working at JCCC as part of the Favorite Nurses "program," they were given a tour by Mitch Seaman and Rodney Perry. During the tour, Plaintiffs allege that Seaman and Perry made inappropriate comments, "leered" at the Plaintiffs'

chests and posteriors, and stood uncomfortably close to them. Perry and Seaman also allegedly followed the Plaintiffs to the women's bathroom, and then stood outside in a manner that made the Plaintiffs uncomfortable.

The Plaintiffs complained about Seaman and Perry's conduct to Ives. Ives allegedly downplayed the situation, and opined that she personally found Perry to be attractive. Comments from one other JCCC employee indicate that Ives held both Seaman and Perry in high regard. In any event, Ives spoke with Seaman and Perry concerning the complaints, but did not initially inform any of her superiors.

After their initial complaint, the Plaintiffs allege that both Perry and Seaman continued to harass them, albeit in different ways. Perry allegedly became "hostile, unfriendly, gruff, demanding and uncooperative." On one occasion, he allegedly demanded that both Plaintiffs be fired. On another occasion, Perry allegedly ordered Nurnberg to draw a blood sample from an inmate for an HIV test, a procedure that Nurnberg was not authorized to perform. When Nurnberg informed Perry she lacked authorization to do such a procedure, Perry became irate and threatened that she would be sorry if she didn't do it.

Seaman, as opposed to showing hostility, allegedly continued to make sexual overtures toward Hunt. He allegedly made sexually inappropriate comments, and asked Hunt personal questions on a daily basis. These included questions and comments about Hunt's love life, home life, whether she had a husband or boyfriend, how her body looked, how her clothes looked, that she would look good in a swim suit, and that she

4

needed a man around the house.  He allegedly made references to his personal sex life and made sexually suggestive gestures in the workplace.  The Plaintiffs also allege that they had problems getting accident/incident reports from Perry and Seaman.  The Plaintiffs allege that the combined conduct of Seaman and Perry made it impossible to do their jobs.

The Plaintiffs complained to Ives again, as well as to some of Ives' superiors, including one Major Eberle.  Upon learning of this, Ives allegedly shouted "Why did you involve that goddamn motherfucker Eberle?," and hung up the phone on Nurnberg.  The Plaintiffs then met with Eberle, Dormire, and Associate Superintendent Jerry Curtit.  At the meeting, Dormire allegedly told the Plaintiffs that they were "doing the program a lot of damage," and suggested that they ought to withdraw their complaints.   Further, after the meeting, when Nurnberg was eating a candy bar, Curtit allegedly told her to "shove it in [her] mouth to keep it quiet."

The Plaintiffs assert that after their initial complaints, Ives too began to retaliate against them.  Ives failed for several months to get employee files that the Plaintiffs needed to do their jobs.  The Plaintiffs further allege that Ives would not give them necessary nursing protocols.  Ives also attempted to change Nurnberg's schedule, requiring her to report in at 5:30 a.m.

After the complaints, the Plaintiffs allege that Dormire began treating them less favorably.  He  began walking by their offices between 10 and 15 times a day to check up on them, but would not talk to them.  Dormire also began giving the Plaintiffs a hard time

when they asked him to sign their timecards. The Plaintiffs allege this caused them significant difficulty, as they began to have trouble finding any other authorized JCCC employees who would sign their timecards. According to the Plaintiffs, Dormire also began requiring the Plaintiffs to sign in and sign out of the institution, even though no other employees were required to do this.

Plaintiffs also assert that Dormire instructed Personnel Clerk Janice Schanzmeyer to begin keeping track of the nurses. Specifically, he wanted new records to be kept indicating when the nurses were out of their offices. Schanzmeyer had JCCC employees start signing a piece of paper (called the "petition" by some witnesses), verifying and briefly describing the circumstances of each time that they went to the nurses' office and found the Plaintiffs absent. Records of the subsequent investigation by JCCC Internal Affairs reveal that one employee refused to sign the petition, because she considered it inappropriate for the Personnel Department to be keeping such records. Dormire subsequently ordered Schanzmeyer not to talk to JCCC harassment investigator Arthur Dearixon, who later investigated the Plaintiffs' complaints, about the petition.

The Plaintiffs also complained to JCCC's Human Services Department Director, Alma McKinney. McKinney told the Plaintiffs that their complaints obligated the department to do an investigation. In performing this investigation, McKinney treated the Plaintiffs' complaints as if they had been made by JCCC employees. Several of the investigatory documents refer to the Plaintiffs as JCCC employees.

The Plaintiffs filed a formal complaint through David Williams, and his supervisor, Arthur Dearixon (JCCC harassment investigator) against Perry and Seaman. They also complained regarding Dormire's suggestion that they drop their initial complaints. Subsequently, Dormire again warned the Plaintiffs that they were damaging the program, and that Perry and Seaman would probably file counter-complaints against them.

There were ultimately two investigations into the Plaintiffs' complaints. The first investigation conducted by Dearixon was limited to Perry's and Seaman's conduct. Dearixon, however, refused to investigate his supervisor, Dormire, and instead referred that investigation to the Department's Internal Affairs Department.

The second investigation was handled by Internal Affairs Officer Edward Robinson, during which he interviewed the Plaintiffs and all of the previously mentioned JCCC employees, as well as others. He then decided to interview Perry, Seaman, and Ives with a Computer Voice Stress Analyzer ("CVSA"). Robinson concluded that the results of Ives', Perry's and Seaman's CVSA "showed deception." Also, during Robinson's investigation, Curtit, the Associate Superintendent, assessed the Plaintiffs' complaints as follows: "I don't want to sound like a chauvinist, but it sounds like a bunch of women sitting in there bitching about everything . . ."

Ultimately, several Department employees were recommended for discipline based on these events, but none of these recommendations were ever carried out. It was recommended that Perry, Seaman and Curtit each receive a "Letter of Caution," and

undergo harassment training. George Lombardi, Director of Adult Institutions, also recommended that Dormire receive a Letter of Caution, or at least an oral reprimand. McKinney concurred in Lombardi's recommendation that Dormire be reprimanded, and further recommended that Ives be formally reprimanded.

After Lombardi's recommendations were issued, Steve Long, the Assistant Director, then wrote Dormire telling him to reprimand Curtit, Perry, and Seaman. Long did not mention Lombardi's and McKinney's recommendations that Dormire also be reprimanded. On July 28, 1998, Dormire wrote Long, refusing to discipline Perry or Seaman, and accusing the Plaintiffs of lying, falsifying records, and "irrational behavior." Long claims he forwarded this letter to Lombardi, but Lombardi denies this.

To date, no one has been disciplined. Both Perry and Seaman received "highly successful" performance evaluations for the relevant time period. McKinney did write a "draft" letter to a Favorite Nurses manager, admitting that "inappropriate comments (the intent of which is not known) may have been made" to the Plaintiffs, but denying that there had been any "blatant or pervasive acts of harassment." McKinney later sent a revised version of the letter, retracting these comments, and stating simply that the investigation's results, "did not support a finding of harassment." Prior to the completion of the investigation, the Plaintiffs had quit Favorite Nurses claiming an inability to deal with what they perceived to be a hostile work environment.

## II. Analysis and Discussion

### A. Plaintiffs' Employment Status

The most important issue raised by the Department's Motion for Summary Judgment is whether this Court has subject matter jurisdiction to hear Plaintiffs' Title VII claims. The Department argues that the Court lacks subject matter jurisdiction because the Plaintiffs were not employees of the Department and therefore have no statutory authorization to sue it.

Under Title VII, an employer is prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). An employee is defined as an individual employed by an employer. 42 U.S.C. § 2000e(f). Given the statutory definition, Plaintiffs clearly were employees at the time the alleged discrimination occurred. At a minimum, they were employees of Favorite Nurses. Neither party disputes this fact. Therefore, this is not the situation addressed in *Schwieger v. Farm Bureau Ins. Co. of Neb.*, 207 F.3d 480 (8th Cir. 2000) or *Wilde v. County of Kandiyohi*, 15 F.3d 103 (8th Cir. 1994) where the Eighth Circuit had to decide whether someone was an employee or an independent contractor. Likewise, the Department is clearly an employer because it is engaged in an industry affecting commerce who has 15 or more employees. 42 U.S.C. § 2000e(f). The more difficult question is whether the Plaintiffs must be employees of the Department in order to bring a Title VII complaint against it.

Plaintiff would answer this question in the negative. They contend that there is no language in Title VII that requires an employee who has been injured by a defendant's

9

employment practices to be employed the defendant. To support their argument, they rely on a line of cases beginning with *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973). In that case the D.C. Circuit held that a defendant is liable for its discriminatory acts if it interferes with an individual's employment opportunities with a third party so long as the defendant controls access to those employment opportunities.

"In *Sibley*, the plaintiff was a male, private-duty nurse who was assigned to patients through a registry and referral system for private-duty nurses in the District of Columbia. The plaintiff was paid directly by his assigned patients and was not employed by the defendant hospital. On two occasions, however, supervisors at the hospital refused to allow the plaintiff to report to female hospital patients to whom he was assigned. The District of Columbia Circuit Court of Appeals held that the plaintiff was permitted to pursue a Title VII claim against the hospital because the hospital, although not plaintiff's employer, controlled the plaintiff's access to his assigned patients." *Diana v. Schlosser*, 20 F. Supp. 2d 348, 351 (D. Conn. 1998).

While the Eighth Circuit has not addressed this question, *Sibley* has been followed in the Eleventh, Sixth and Ninth Circuits and the breadth of its application has been expressly left open in the Seventh Circuit. *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1532 (11th Cir.), *cert. denied*, 498 U.S 943 (1990); *Christopher v. Stouder Mem'l Hosp. of San Jose*, 936 F.2d 870 (6th Cir.), *cert. denied*, 502 U.S. 1013 (1991); *Gomez v. Alexian Bros. Hosp.*, 698 F.2d 1019, 1021 (9th Cir. 1983); *Alexander v. Rush North Shore Med. Ctr.*, 101 F.3d 487, 493, n.2 (7th Cir. 1998) ("We come to the conclusion that Dr.

10

Alexander is an independent contractor because he is also not an employee of his patients, just as an insurance agent or a limousine driver is not an employee of her customers. It is important to note that our ruling today is limited to overturning *Doe's* holding that a physician may bring a Title VII action against a hospital even though he is an independent contractor and not an employee. We have no occasion to go further and determine if a Title VII plaintiff must always demonstrate that he is an employee of the defendant employer. Thus, we continue to leave open the question that went unanswered in *Shrock*, 810 F.2d at 660–i.e., whether an employee of employer may bring a Title VII action against employer Y when Y is not his employer, but merely someone whose discriminatory conduct interferes with his employment with employer X"). The Second Circuit has expressed support for the reasoning in *Sibley*, but the Fourth Circuit has suggested it would reject the *Sibley* analysis if confronted with it. *Cf.*, *Spirt v. Teachers Ins. and Annuity Ass'n*, 691 F.2d 1054, 1063 (2nd Cir. 1982), *vacated on other grounds*, 463 U.S. 1223 (1983), *cert. denied*, 469 U.S. 881 (1984) and *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 188 (4th Cir. 1998). Several District Courts within the Eighth Circuit have also relied on the *Sibley* analysis to find subject matter jurisdiction even though the plaintiffs were not hired or paid directly by the defendants. *See Duncan v. Junior College Dist. of St. Louis*, No. 98-CV-1220 (E.D. Mo., Nov. 15, 1999); *Moland v. Bil-Mar Foods*, 994 F. Supp. 1061 (N.D. Iowa 1998); *King v. Chrysler Corp.*, 812 F. Supp. 151 (E.D. Mo. 1993). Because the Court finds the reasoning of *Sibley* and its progeny

persuasive, the Court concludes that it has subject matter jurisdiction over the Plaintiffs' claims.²

Indeed, the case for subject matter jurisdiction is substantially stronger here than in *Morland*, *King*, or *Duncan*. In those cases, the plaintiffs were merely working at the defendant's job site but were, in fact, doing their own employer's work there. Hunt and Nurnberg were effectively leased employees doing the work of the Department. The Plaintiffs were initially contacted, interviewed, and hired by Ives, a Department employee. The premises, tools, and instrumentalities of the Plaintiffs' work were exclusively controlled by the Department. Plaintiffs were forced to rely on Department employees, including Ives, Perry and Seaman, for nursing protocols, employee files, accident/incident reports, and other information necessary to perform their jobs. Plaintiffs were also forced to rely on Department employees to sign-off on their timecards. Finally, there are allegations that Dormire pressured the Plaintiffs to retract their complaints by warning them that the complaints were damaging the employee nurses program. This "warning" can be interpreted as a threat to the existence of the

---

² The question of whether the Court has subject matter jurisdiction over the retaliation claim is a close question under the *Sibley* analysis. *See Moland*, 994 F. Supp 1061. The Court, however, has been persuaded by the reasoning in *Diana*, 20 F. Supp. 2d 348. The Court also relies on the guidance provided by the U.S. Supreme Court in *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) where the Supreme Court determined that former employees could bring suit for retaliation even though the acts of retaliation occurred post-employment. To reach that conclusion, the Court acknowledged that the term employee as used in the retaliation section of Title VII is ambiguous and relied in part on the broad remedial purpose of Title VII to resolve that ambiguity in favor of a more expansive reading of the word employee. *Id.* at 345.

program, and with it, the Plaintiffs' jobs, evidencing the obvious control that the Department exercised over Plaintiffs' employment opportunities.[3]

B.  **MHRA Claims**

The Department contends that the Plaintiffs' Missouri Human Rights Act claims are barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). The Plaintiffs do not contend otherwise. The Court will therefore grant summary judgment on these claims.

C.  **Sexual Harassment Claims - Hostile Work Environment**

---

[3] Because the Court finds that *Sibley* is applicable to this case, the Court does not address the question whether the Plaintiffs were in fact dual employees of Favorite Nurses and the Department. Dual employment is a concept frequently relied on in the labor context. For example, in *NLRB v. Western Temporary Servs.*, 821 F.2d 1258 (7th Cir. 1987) the question was whether a temporary employee supplied by a third party would be permitted to participate in union elections. The Seventh Circuit relied on four factors to determine if the temporary employee had a sufficient connection to the employer to treat them as employees for organizing purposes. The four factors were (1) Did the employer request the employee by name from the temporary agency? (2) Was there a long term relationship between the on-site employer and the temporary employee? (3) Did the employee work at the same facility as the company's permanent workers? and (4) Was there a potential for permanent employment? The issue of dual employment has also been tackled in the context of Title VII claims. In *Amarnare v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 611 F. Supp. 344 (S.D.N.Y. 1984), *aff'd*, 770 F.2d 157 (2nd Cir. 1985) a temporary employee filed suit against the brokerage firm where she had been placed alleging discrimination by the brokerage firm. The Court determined that the brokerage firm was her employer for Title VII purposes because it had the "right to control [the] means and manner of individual performance." *Id*. at 348. In *Magnuson v. Peak Tech. Servs., Inc.*, 808 F. Supp. 500 (E.D. Va. 1992), the Court found that a temp was the employee of the company that had contracted with the temp agency as well as being an employee of the agency. To reach this conclusion, the Court considered who set the work schedule, who signed the employee's timeslip, and whether the temporary employee reported to an on-site supervisor. Such things as on-site interviewing and training were also considered.

The Department contends that the Plaintiffs have failed to establish a *prima facie* hostile work environment claim because the conduct alleged was not sufficiently severe and pervasive to be actionable. No authority is provided indicating summary judgment would be appropriate here. There is evidence that Perry and Seaman harassed both Plaintiffs during their initial tour. Viewing the evidence in the light most favorable to the plaintiff, there is further evidence that despite the Plaintiffs' repeated complaints about Perry and Seaman, Perry became belligerent toward the Plaintiffs and Seaman continued his romantic overtures toward Hunt, and that both were uncooperative in providing the Plaintiffs with accident/incident reports. On this evidence, and in the absence of any clear authority to the contrary, the Court believes summary judgment to be inappropriate. Genuine issues of material facts remain for the jury.

### D. Retaliation Claims

The Department contends, without authority, that the Plaintiffs' retaliation claim is unsound because there was no adverse employment action taken against them. The Plaintiffs respond that constructive discharge, like any other discharge, is an adverse employment action. *See West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995) (citing *Landgraf v. USI Film Prods.*, 968 F.2d 427, 431 (5th Cir. 1992), *aff'd on other grounds*, 511 U.S. 244 (1994); *Jordan v. Clark*, 847 F.2d 1368, 1377 n. 10 (9th Cir. 1988), *cert. denied*, 488 U.S. 1006 (1989)). The Court finds the Plaintiffs' authority binding, and will deny summary judgment on this issue. Genuine issues of material fact remain for the jury.

## III. Interlocutory Appeal

The Defendants have requested the Court to certify the question of subject matter jurisdiction to the Court of Appeals pursuant to 28 U.S.C. § 1292(b). The Court declines to do so. A certification at this stage would prevent the case from being heard on its scheduled trial date. The issue has previously been certified by a district court to the Eighth Circuit, *see Moland*, 994 F. Supp. 1061, and the Court of Appeals declined certification. Furthermore, the question of whether Hunter and Nurnberg were under the control of the Department as required by *Sibley* or were joint employees of the Department and Favorite Nurses are dependent on facts that appear to be in dispute.

## IV. Conclusion

For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion for Summary Judgment [Doc. #42] is GRANTED as to the Plaintiffs' Missouri Human Rights Act claims, but DENIED as to all other claims. It is further

ORDERED that Defendant's Conditional Motion Requesting Certification of Case for Interlocutory Appeal under 28 U.S.C. § 1292(b) [Doc. #70] is DENIED.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: August 30, 2000
Kansas City, Missouri